**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JASON DEROUEN** | **CIVIL ACTION NO. 2:13-cv-04805 c/w 13-4806 and 13-5060** |
| **VERSUS** | **JUDGE ELDON E. FALLON**<br>**MAG. SALLY SHUSHAN** |

**HERCULES LIFTBOAT COMPANY, LLC,**
**Y & S MARINE, INC., and**
**SUN BOATS, INC.**

****************************************************************************************************

# PRE-TRIAL ORDER

****************************************************************************************************

I.

The pre-trial conference in this matter is set for September 8, 2015 at 1:30 p. m.

II.

**APPEARANCE OF COUNSEL:**

Daniel S. Foley
Foley, Lamy and Jefferson
228 St. Charles Avenue, Suite 1110
New Orleans, LA 70130
(504) 586-9395

Frank E. Barber
Attorney-at-Law
116 Field St.
New Iberia, LA 70560-4487
(337) 256-8370

Rebecca A. Cunard
Cunard Law Firm
9214 Interline Avenue
Baton Rouge, LA 70809
(225) 925-2978

Attorneys for Jason Derouen, and Lollo Francis, III, Plaintiffs

and

Daniel S. Foley
Foley, Lamy and Jefferson
228 St. Charles Avenue, Suite 1110
New Orleans, LA 70130
(504) 586-9395

David Abraham
5040 Ambassador Caffery Pkwy.
Lafayette, LA 70508
(337) 234-4524
Attorneys for Nathaniel Parker, plaintiff

Anthony J. Staines
Jason R. Kenney
Staines & Eppling, LPAC
3500 North Causeway Blvd.
Suite 820
Metairie, LA 70002

Attorneys for Sun Boats, Inc., Y & S. Marine, Inc., Timothy Sykes, Tho Duc Nguyen a/k/a Tho Duke Nguyen, and Samsung Fire & Marine Insurance Company (Samsung Fire & Marine Insurance Co., Ltd), defendants

PED C. KAY, III
Broussard & Kay, LLC
909 Garber Rd.
Broussard, LA 70518

Attorney for Hercules Liftboat Company, LLC, defendant

III.

**DESCRIPTION OF PARTIES**

Plaintiffs in this matter are Jason Derouen, a 45 year old resident of New Iberia, LA, Lollo Francis, III, a 36 year old resident of Lafayette, LA, and Nathaniel Parker, a 40 year old resident of Carencro, LA. These claims arise out of injuries that they suffered while

being transferred on a personnel basket from a liftboat, the M/V Tilapia, on to the stern deck of the M/V Sun Ray on September 26, 2012.

The defendants are:

(a) Y&S Marine, Inc., a corporation chartered under Louisiana law and domiciled in Louisiana. At all times relevant herein, this defendant was the bareboat charterer and operator of the crew boat, the M/V Sun Ray. It was also the employer of the crew of the M/V Sun Ray.

(b) Sun Boats, Inc., a corporation chartered under Louisiana law and domiciled in Louisiana. At all times relevant herein said defendant was the owner of the M/V Sun Ray.

(c) Samsung Fire & Marine Insurance Company (Samsung Fire & Marine Insurance Co., Ltd.). This insurer had in full force and effect a policy of liability insurance insuring Y & S Marine, Inc. and Sun Boats, Inc. with limits of coverage of one million dollars ($1,000,000.00).

(d) Hercules Liftboat Company, LLC, a limited liability company chartered under the laws of Delaware and doing business in Louisiana. At all times relevant herein, it owned and operated the Lift Boat Tilapia. On September 26, 2012, the crew of said vessel, including Richard Flores, the Hercules crane operator on the morning of September 26, 2012, was in the course and scope of employment with said defendant.

IV.

**JURISDICTION**

Jurisdiction is established. Plaintiffs claims arise under the General Maritime Law of the United States. Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1333(1).

V.

**PENDING MOTIONS**

(1) Motion in Limine filed by Y&S, Sunboats, and Samsung to limit the testimony of Charles Nolan, plaintiffs' Marine Expert.

(2) Motion in Limine filed by Y&S, Sunboats, and Samsung to limit the testimony of Stephen Killingsworth, a Hercules expert.

(3) Motion in Liminie filed by Hercules Liftboat Company, LLC to exclude and/or limit the testimony of Robert S. Borison or alternatively, to establish the limited weight to be afforded Borison's opinions/testimony.

VI.

**SUMMARY OF MATERIAL FACTS:**

**LIABILITY ONLY**

**PLAINTIFFS**:

Jason Derouen, Lollo Francis, III, and Nathaniel Parker, all non-seamen employees of Grand Isle Shipyard, were injured in the early morning hours of September 26, 2012 while riding a Billy Pugh personnel basket moving from the Liftboat Tilapia, where they were quartered, to the M/V Sun Ray, a crew boat manned and operated by Y&S Marine. On that

date, the Tilapia was located adjacent to a Chevron fixed platform designated as BM3 - Oscar in Bay Marchand. The top deck of this rectangular platform was thirty- five feet above the surface of the water. The Tilapia's bow was "faced up" to the platform. It was elevated on its three legs (jacked up out of the water) with its hull completely out of the water. The Tilapia's deck was elevated thirty-five feet above the water surface, even with the top deck of the fixed platform. Photographs of the Chevron platform, the Tilapia, and the M/V Sun Ray will be introduced into evidence along with a diagram of the accident scene made by Captain Nguyen showing the orientation of the M/V Sun Ray's stern towards the fixed platform and the Tilapia.

**THE CONDITIONS**

When the personnel transfer took place, it was dark. Captain Nguyen of the M/V Sun Ray elected to receive the personnel basket on the port side of the Tilapia. As such, the crane operator on the Tilapia used the port side crane to lift the basket off the deck of the Tilapia and position it over water on the Tilapia's port side. Uncontested facts **No. 3 & 9** show that the operator's seat on this crane was approximately eight feet above the deck of the Tilapia. This means that the crane operator was sitting greater than forty-feet above water. Sea conditions were two to three feet with variable winds of 5 to 15 knots. The winds, swells, and current were all striking the stern of the M/V Sun Ray from the same direction. Captain Nguyen backed his stern up in line with the wind, seas, and current. He positioned his vessel under the basket such that his port stern was ten feet from a leg of the elevated Tilapia. The starboard stern of the M/V Sun Ray was positioned fifteen feet from the fixed platform. To hold position, he had to put the engines in reverse to counteract the combined

forces of the winds, seas and currents. From time to time, his vessel moved closer to the Tilapia than he wanted. On several occasions, Captain Nguyen had to change throttle positions to forward and then back into reverse to maintain his position underneath the basket. Testimony will reveal that he had difficulty holding this position and that his aggressive change in throttle positions created a bounce effect of his stern. Proximity to the leg of the Tilapia diverted the captain's attention from overall assessment of what was needed to implement a safe personnel basket transfer. Approaching seas and incoming swell trains (a series of waves) were not properly monitored. Considering the size of the M/V Sun Ray and the forces of the variable winds, sea swells, and current all pushing against the stern of the M/V Sun Ray, by placing his vessel's port stern as close as it was to a leg of the Tilapia, Captain Nguyen became overly focused on avoiding a collision with the leg of the Tilapia.

**IMPLEMENTATION OF A SAFE TRANSFER**

Transferring men on a Billy Pugh basket in the Gulf of Mexico requires the skill of a well trained crane operator and the exercise of care on the part of the captain and crew of the receiving vessel. Their efforts must be collaborative and proper communication is essential. Safety protocol in the Gulf of Mexico requires that a personnel basket transfer to a moving vessel be skillfully timed so that the initial contact of the basket with the stern of the receiving vessel takes place when its stern is in the trough of a wave. This safety practice and standard was recognized by Captain Nguyen, Mr. Flores, the Hercules crane operator, Emmet Scobel, III, a vice president of Y&S, Charles Nolan, plaintiffs' marine expert and Steve Killingsworth, Hercules' expert. Indeed, this safety practice is mandated in Chevron's Contractor's Hand Book. (Exhibits 3 & 4). Y&S Marine and Hercules were both

contractually obligated to follow Chevron's safety standards. **A basket should contact the boat at the bottom of a swell.** Significantly, Chevron's safety standards specifically state that passengers riding a personnel basket **should not get off if the basket contacts the boat at the top of a swell because of the risk of falling as the boat drops away from the basket.** This is important because it negates defendants' contentions that the plaintiffs were comparatively at fault. In this case, the Y&S deck hand on the M/V Sun Ray deliberately timed the initial contact between the basket and the stern deck of the crew boat at the crest of a wave, a negligent departure from appropriate safety protocol. No properly trained deck hand should do this. The initial impact jolted the three passengers on the basket. An immediate air gap of four feet ensued between the basket and the deck of the receiving vessel which was estimated to be "chest high" by Sykes, the M/V Sun Ray's deck hand. When the stern of the M/V Sun Ray rose up again in the seas within a second or two, the basket was again forcefully struck, causing the men in the basket to lose their balance and grip on the ropes of the Billy Pugh basket as it started to collapse. Francis and Parker fell backwards off the basket onto the deck of the boat. Derouen fell into the center of the basket and became entangled in the ropes of the basket.

## A SAFE PERSONNEL BASKET TRANSFER REQUIRES OBSERVATION OF APPROACHING SEAS

Timing the initial contact of a Billy Pugh basket with the stern deck of a crew boat moving up and down in the seas requires observation of approaching seas. In addition to timing the initial contact of the basket with the stern of a receiving vessel when it is in the trough of a wave, industry practice and Chevron's own safety protocol require the observance of approaching seas to monitor swell trains (a series of waves) to avoid the

occasional greater than normal swell. A competent crane operator and competent mariner both know that "two to three foot seas" within a swell train will involve one or more swells being greater than three feet, and one or more swells being lower than two feet. Safe implementation of a personnel basket transfer also involves timing the initial contact with the basket with the stern deck of a receiving vessel at the low end of a swell train. The captain and deck hand of the M/V Sun Ray were negligent in causing mistimed contact between the basket and the M/V Sun Ray. Richard Flores, the Hercules crane operator on the Tilapia, was negligent in failing to clearly communicate to the crew of the M/V Sun Ray that he was totally dependent on their view of the seas to implement a safe personnel basket transfer. Y&S and the M/V Sun Ray contend that it was the responsibility of the Tilapia's crane operator to time the initial contact of the basket with the deck of the M/V Sun Ray. Mr. Flores operated under the assumption that the deck hand on the M/V Sun Ray was monitoring the approaching seas to synchronize initial contact between the basket and the stern deck of the M/V Sun Ray when its stern was in the trough of a wave and on the low end of a swell train. In this case, the left hand did not know what the right hand was doing. Both parties were to blame.

**FAILURE TO COMMUNICATE**

For the Tilapia's crane operator to monitor and observe sea swells properly, he had to be properly positioned. Observation of approaching seas is a necessity to implement a safe and timely contact between a personnel basket and the stern of a receiving vessel. The Hercules crane operator, Mr. Flores, was not able to observe the swells approaching the stern of the M/V Sun Ray. His height above water and the surrounding darkness impaired his vision of the seas. Critically, Mr. Flores' line of vision of approaching swells was

obstructed by the Chevron fixed platform and the elevated Tilapia. Swells, wind, and current were approaching the M/V Sun Ray from under the raised fixed Chevron platform and elevated Tilapia. Mr. Flores did not clearly communicate this problem to the crew of the M/V Sun Ray.

This accident should not have happened. There were antecedent acts of negligence in selecting a vessel too small to accept a basket transfer under the prevailing conditions. Captain Nguyen's decision to allow the transfer to take place so close to a leg of the Tilapia made maneuvering precarious, thereby diverting the captain's attention from supervising a safe transfer of the plaintiffs. The transfer should have been delayed until day light to allow the crew of the M/V Sun Ray to better observe the approaching seas. Y&S management failed to properly train Sykes, the deck hand, regarding the timing of a personnel basket transfer. The Hercules crane operator did not have a proper view from his position on the crane to monitor approaching seas. Actors on both vessels failed to communicate. In the face of all these acts of joint and concurrent negligence, plaintiffs' marine expert, Captain Nolan, will testify that this accident would not have happened had proper safety protocol been followed such that the initial contact between the personnel basket and the deck of the M/V Sun Ray occurred at the low end of a swell train and when the stern of the vessel was in the trough of a wave. It is within the provence of this Honorable Court to make findings of fact regarding negligence and the allocation of fault. From the plaintiffs' perspective, the gravamen of this case is that the vessel transfer was mistimed and the crew of the M/V Sun Ray was at greater fault than Hercules for causing this accident.

**COMPARATIVE FAULT**

Plaintiffs had no opportunity to safely exit the personnel basket. The first contact of the basket with the stern deck of the crew boat was unanticipated and violent. It was mistimed to occur when the stern was riding the crest of a wave and an air gap immediately followed. The second impact occurred when the receiving vessel was riding the crest of a subsequent wave. The resulting impact knocked Parker and Francis off of the basket and they fell backwards like "felled trees." Derouen fell face forward into the basket. The defendants may try to exploit the testimony of Lollo Francis, III, one of the men on the basket, who testified in his deposition that he had an opportunity to get off of the basket. The evidence will clearly establish that his testimony was in error. Mr. Francis never tried to get off the basket. His testimony was devoid of reality. The first impact was unanticipated and the vessel immediately separated from the basket. The second impact caused Mr. Francis to fall backwards. Moreover, any attempt to get off of the basket when the stern struck the basket at the crest of a wave was contrary to Chevron's recommend safety practice.

**BY HERCULES LIFTBOAT COMPANY, LLC**:

Y&S Marine moved for a bifurcated trial on liability because it contends it has no fault. This Court will be required to look at the facts of this case and decide whether this was a fault based accident or not. In this regard, each party to the lift team had separate and distinct obligations as will be identified herein.

A quick dissertation of the facts. Chevron contracted with GIS (employer of the plaintiffs), Y&S Marine and Hercules to provide certain services in support of its oil and gas

operations conducted in Louisiana State territorial waters, i.e., Bay Marchand field. Specifically, GIS provided Electrical & Instrumentation Technicians. Y&S Marine is the owner/operator of the M/V Sun Ray (and its crew) providing vessel support services to Chevron in this region. On September 26, 2012, the M/V Sun Ray crew members included Captain Nguyen and Timothy Sykes ("Sykes"), the deck hand/captain. Hercules is the owner/operator of the liftboat *Tilapia*. On the day in question, the *Tilapia* crew members included Captain Stokes, Richard Flores (crane operator/deckhand) and Dugas (deckhand). Since living quarters were limited, the plaintiffs would return each day following their work and sleep/eat on the *Tilapia*.

At some time in the morning hours of September 26, 2012, the M/V Sun Ray was dispatched by Chevron to the BM 3 Oscar platform to transport personnel. A larger vessel was usually used for these type transfers. The three plaintiffs were to be transferred from the *Tilapia* to the M/V Sun Ray via personnel basket. Accordingly, the lift team consisted of the following persons: Captain and deckhand on the M/V Sun Ray, crane operator on the *Tilapia*, and three passengers/plaintiffs employed by GIS. All participants were properly credentialed/certified to perform their designated jobs on this transfer. At the time of the incident (approximately 6:15 a.m.), the *Tilapia* was elevated out of the water and positioned adjacent to a BM 3 Oscar platform. It is undisputed that the wind, seas and current were all coming from the southeast direction. Winds were approximately 10 to 15 knots. The seas were 2 to 3 foot.

Captain Nguyen and Flores spoke and discussed the facts and circumstances surrounding the transfer. Weather and sea conditions were assessed by both the crane

operator and the captain and found to be within acceptable tolerances. As the Master of his vessel, Captain Nguyen decided to position the port-side of his vessel to the port-side of the *Tilapia* to prevent the sea conditions pushing his vessel into the legs of the *Tilapia* and/or platform. For the Court's benefit, after the incident, Captain Nguyen drew a diagram depicting the configuration of the platform/vessels and the direction of the prevailing sea conditions. [Doc. 93-2] In their pre-transfer discussions, Captain Nguyen advised Flores that he could maintain his vessel in this location during the transfer process.

Due to numerous factors, the captain and/or deckhand of the M/V Sun Ray knew that the Y&S deckhand had to assist the crane operator with the timing and landing of the personnel basket on the deck of its vessel. In this regard, Sykes acknowledged that he was the designated signalman on this transfer. This is because the captain and/or deckhand of the M/V Sun Ray were in the best position to gauge/evaluate the incoming wave cycles as these sea conditions passed through the legs of the platform/*Tilapia* and impacted the stern of the M/V Sun Ray. These factors include, but are not limited to, the following: Darkness/poor lighting, position of the crane operator in a fixed seat located 45 to 50 feet above the water's surface, seas were approaching crane operator from his back/blind spot, the crane operators view of the incoming seas as it impacted the stern of the M/V Sun Ray was obstructed by the platform/*Tilapia*, the angle of the different lights and their reflections coming from the vessels/platform, and the pre-transfer discussions between the crane operator and Captain Nguyen/Sykes. Furthermore, a personnel basket transfer in these type conditions can present problems with the crane operator's line of sight and/or depth perception. Under the circumstances, Sykes had to monitor the wave cycle to ensure he

would time the landing of the personnel basket at the optimal time. Sykes knew or should have known this as he was a captain as well. Further, the pre-transfer job safety analysis acknowledged communication through signals would be used.

Even though everyone on the lift team had stop work authority, no one on the lift team complained of any potential problems and/or hazardous prior to the lift taking place. The protocol followed on this lift was as follows: The crane operator conducted a pre-use inspection of the crane and personnel basket before beginning the lift. After discussing all issues surrounding the transfer, both the crane operator and captain concluded that the transfer could be performed safely. In this regard, Captain Nguyen advised the crane operator that he could hold his vessel even though he failed to perform a pre-test to determine if his vessel could maintain position in the approximate area that the lift was to take place. Weather and sea conditions were discussed and assessed between the parties. Due to the factors listed above, the crane operator advised the Y&S crew that he would be relying upon the designated signalman/ deckhand to assist with the landing of the personnel basket on the deck of their vessel. Captain Nguyen and Sykes admit the deckhand's responsibility in this regard.

After it was confirmed that the passengers were wearing the appropriate safety gear and ready for the lift, the personnel basket was lifted off the deck of the *Tilapia*. The crane operator then raised the personnel basket high enough to clear all obstacles on the *Tilapia* and the platform before booming the basket over the water. Once the personnel basket was positioned over the water, Sykes signaled/instructed the crane operator to boom down to an angle of approximately 55 to 60 degrees. Thereafter, Sykes instructed the crane

operator to lower the personnel basket over the water until the deckhand gave him the stop signal. When the stop signal was given, the personnel basket was five (5) to ten (10) feet above the water line. Once the deckhand gave the all stop signal, the Y&S captain /deckhand maneuvered the M/V Sun Ray underneath the personnel basket for its final descent. In this regard, Captain Nguyen positioned the port stern of his vessel to within 10 feet of the leg of the Tilapia and 15 feet of the closest side of the fixed platform.

Once the M/V Sun Ray was positioned underneath the personnel basket, Sykes testified that he gave the final descent signal to the crane operator with the intent to land the personnel basket on the deck of his vessel at the crest of the wave. Under the circumstances, the crane operator was reliant on Sykes to properly time the final descent signal with the incoming wave cycle since the crane operator could not accurately assess the incoming sea conditions based on his elevated position. Consequently, unless the crane operator sees some problem from his view point some 45 to 50 feet above the water line, the crane operator is expected to follow the signals provided by the deckhand/signalman. Importantly, once the Y&S deckhand gave the final descent signal, no other signals were provided by the deckhand to the crane operator before the incident. Consequently, it is undisputed that the crane operator properly followed all signals provided by the Y&S deckhand/designated signalman prior to the incident.

Upon lowering the personnel basket, the personnel basket made initial contact with the stern deck of the M/V Sun Ray. However, unbeknownst to the crane operator, Sykes had timed the landing of the personnel basket at or near the crest of a wave rather than the trough of the incoming wave. This is contrary to industry standards and practices. Sykes

should be monitoring the wave cycle to ensure that he is timing the landing of the personnel basket at the optimal time in the trough of the wave. Moreover, due to his close proximity to the legs of the platform/*Tilapia*, Captain Nguyen can alter the normal vertical rise and fall of the stern deck by operating the vessel in rapid changes of reverse-neutral-forward or forward-neutral-reverse to maintain station. As intended by Sykes, it appears initial contact was made while the M/V Sun Ray was in an upward vertical movement, i.e., riding up the wave. The passengers/plaintiffs of the personnel basket did not quickly get off the basket when initial contact was made. Thereafter, the stern deck of the vessel fell, creating an air gap between the stern deck and the personnel basket. It also appears that this wave/swell was larger than the normal 2 to 3 foot seas. Due to the sea conditions and/or the actions of Captain Nguyen/Sykes, the stern deck of the vessel made a subsequent contact with the personnel basket, which result in the alleged injuries claimed by the passengers/plaintiffs.

The Court should note that Captain Nguyen, Sykes, Flores and Francis (a plaintiff in this matter) all testified that, upon initial contact of the personnel basket with the stern deck of the M/V Sun Ray, there was sufficient time for the passengers to quickly exit the personnel basket. However, Francis testified the reason he did not exit the personnel basket at that time was because the deckhand/Sykes failed to instruct him to get off. Based on this evidence, the Court can conclude that the plaintiffs failed to comply with industry standards and practices relative to quickly exiting from the personnel basket at the time of first contact of the personnel basket with the deck of a receiving vessel. Had this been done, no injuries would have occurred.

Furthermore, Francis testified that sometime after the initial contact of the personnel

basket with the stern deck of the M/V Sun Ray, Francis was able to exit from the personnel basket without injury. However, after exiting from the personnel basket, Francis returned to the personnel basket and placed his foot on the bottom ring of the personnel basket to retrieve his bag from the center of the basket. Shortly after placing his foot on the personnel basket, the personnel basket lifted up unexpectedly and Francis fell to the stern deck resulting in his alleged injuries. Hence, the actions of Francis returning to the personnel basket when it was not under control was a direct violation of industry standards and practices.

Sykes violated industry standards and practices when he instructed the crane operator to land the personnel basket at the crest of a wave rather than the trough. Everyone who has testified in this matter, with the exception of Sykes and Robert Borison (Y&S safety expert), have stated that the personnel basket should be landed at the trough rather than the crest. Furthermore, Sykes did not just instruct the landing of the personnel basket at the crest of a wave but he landed it at the crest of a larger swell that the crane operator could not assess. Hence, could the crane operator reasonably rely upon the fact that when Sykes was timing the landing of the basket on his vessel that he would do it according to the safety protocol required by industry standards/practices and/or Chevron's safety policies that the contractors were operating under? Consequently, when Sykes intentionally timed the landing of the personnel basket at the crest of a larger swell, the crane operator did not have sufficient time to respond to the movement of the M/V Sun Ray as compounded by Captain Nguyen's actions. Under these circumstances, the crane operator reasonably thought that Sykes would be timing the contact at the trough of the

wave.

Besides the fault of the plaintiffs, Y&S Marine alternatively contends that this incident occurred due to the actions of the crane operator by overcompensating the air gap that formed after he landed the personnel basket as per instructions from the deckhand at or near the crest of the wave. Remember, the plaintiffs were NOT injured when the personnel basket first made contact with the deck of the M/V Sun Ray. Hence, Y&S Marine conveniently forgets about the fact that the reason an air gap was allowed to form was because the deckhand instructed the crane operator to land the basket at or near the crest. Moreover, contrary to Y&S Marine's contention, the crane operator did not allow the personnel basket to free-fall. Consequently, the only way the personnel basket fully collapsed (as contended by Y&S) was the actions of Captain Nguyen in maintain station in such tight quarters. The actions of Captain Nguyen applying rapid changes to the throttle/gears of his vessel would compound the speed and/or height of the vertical rise and fall of the stern deck which would intensify any impact between the personnel basket and his vessel.

If the Court determines this to be a fault based accident, then the actions/inactions of the entire lift team must be considered. Under these circumstances, the crane operator followed all signals provide to him by the designated signalman/Sykes.

**BY Y&S MARINE, LLC, SUN BOATS, LLC. AND SAMSUNG FIRE & MARINE INSURANCE COMPANY:**

**<u>Background</u>**

The alleged incident occurred on the morning of Wednesday, September 26, 2012

at 6:30 a.m., just after civil twilight. The weather was clear with winds out of the Southeast at just under 12 knots and sea conditions at nearby buoys measuring approximately 1 foot. At the time of the alleged incident, the M/V SUN RAY, which is operated by Y&S Marine, was servicing the field in which the L/B TILAPIA, a lift boat owned and operated by Hercules Liftboat Company ("Hercules"), was located and was called to the BM-0-3 platform, where the L/B TILAPIA was jacked up. Specifically, the L/B TILAPIA's bow was against the BM-0-3 platform and was connected via a 30' catwalk.

That morning, the M/V SUN RAY was crewed by deckhand Timothy Sykes and Capt. Tho Ngyuen. The crew of the L/B TILAPIA included the crane operator, Richard Flores, and the captain, Christopher Stokes. Once the SUN RAY reached the L/B TILAPIA the crew of the SUN RAY was told that three employees of Grand Isle Shipyards ("GIS"), Jason Derouen, Nathaniel Parker, and Lollo Francis would be loaded on to their boat via collapsible personnel basket. All three companies (GIS, Hercules, and Y&S) were working for Chevron at the time.

This personnel transfer was to be accomplished using a four-man collapsible personnel basket. The plan was to lift the personnel basket with the port side crane on the L/B TILAPIA and lower the basket with the men to the deck of the M/V SUN RAY. This was a normal activity for all involved.

**The Lift**

The three plaintiffs loaded onto a 4 man collapsible personnel basket, a Billy Pugh X-870 model, and were lifted off the deck of the L/B TILAPIA by the port side crane. The port crane is a 30 ton crane with an 80' boom. The crane operator, Mr. Flores, recalled that the boom was fully extended when the lift commenced. The crane operator then lifted at

a 70 degree angle and swung the personnel basket over the water. Below, the M/V SUN RAY had positioned itself stern into the seas, wind, and current and was waiting for the personnel basket to be lowered over the water so it could move into position.

After the personnel basket was 10'-12' above the water, the crane operator stopped lowering the basket so that the M/V SUN RAY could move into proper position under the basket. At that time, the crane boom was at an angle of about 60°, the boom still fully extended to its 80' length. The basket was approximately 15' from the port side of the L/B TILAPIA. When the M/V SUN RAY moved into position, it's stern was directly into the wind, waves, and current. The vessel was located roughly 10' from the port leg of the L/B TILAPIA and 15' from the nearby fixed platform.

**The Basket Makes a Safe Landing**

After the M/V SUN RAY was in the appropriate position, the crane operator lowered the basket to the deck of the M/V SUN RAY. The basket made an initial "safe landing" on the deck of the M/V SUN RAY, but the riders failed to disembark the basket. The basket was on the deck of the M/V SUN RAY long enough for the riders to disembark and step away. In fact, Mr. Francis stepped off the basket and onto the deck of the M/V SUN RAY safely. However, Mr. Francis then moved back to the basket and placed one foot on the ring of the basket to retrieve his belongings from the center of the basket. For unexplained reasons, the other two plaintiffs simply stayed on the basket. As soon as Mr. Francis placed his foot back on the personnel basket, the basket broke contact with the deck and an air gap was created between the deck of the M/V SUN RAY and the personnel basket. Had the riders disembarked when the basket initially landed on the deck of the M/V SUN RAY,

like Mr. Francis did, and had Mr. Francis not placed his foot back on the ring of the basket, this accident would not have occurred.

**The Plaintiffs' Actions**

Undoubtedly, had the plaintiffs followed proper personnel basket transfer protocol, the incident would not have occurred. The plaintiffs had been properly trained by their employer, GIS, who required the plaintiffs to undergo personnel basket training that included: (1) watching an instructional video; (2) performing hands on exercises with a personnel basket; (3) understanding the dangers associated using a personnel basket; and (4) understanding the needed precaution in using a personnel basket. Despite their extensive training, only Francis let go of the personnel basket and stepped back as soon as contact was made with the deck of the M/V SUN RAY. The other two plaintiffs stayed on the basket. Mr. Francis also departed from his training when he returned to the basket to retrieve his belongings before he was certain that the basket was under control.

**The Basket Breaks Contact and An "Air Gap" Is Created**

After the initial safe landing, the personnel basket broke contact with the deck of the M/V SUN RAY. The air gap between the vessel and the bottom of the basket is estimated, at a maximum, as being chest height on Mr. Sykes, who is 5'7". The basket then impacted the deck of the vessel a second time, and then broke contact a second time, before landing a third and final time. After the final landing, Mr. Derouen fell forward into the netting of the basket, and Mr. Francis and Mr. Parker fell out of the basket onto the deck of the vessel. As stated above, the accident would not have occurred had the plaintiffs performed the transfer as they were trained and stepped away from the basket as soon as it contacted the

deck and not returned until they were sure it was under control. However, in the alternative, the basket broke contact solely because of the fault and the failures of the crew of the L/B TILAPIA, specifically the crane operator and captain of the liftboat.

**The Crane Operator and Liftboat Captain Failed to Abide By Hercules' Company Policy**

Prior to performing a personnel basket transfer, the crane operator, Flores, and the liftboat captain, Mr. Stokes, must accomplish the following, as mandated by Hercules: (1) a valid Permit To Work must be issued, (2) a JSA must be completed with the liftboat captain, the crane operator, and the riders as well as the crane operator of the crew boat, (3) a "dry run" should be done by the crane operator where he practices landing the personnel basket on the deck of the crew boat; and (4) a weather scorecard should be utilized. Of those four pre-lift requirements, Mr. Flores and Mr. Stokes only satisfied the JSA requirement, but even the JSA was deficient.

The captain of the L/B TILAPIA, Mr. Stokes, acknowledged that the crane operator was supposed to have a valid Permit To Work before performing the personnel transfer. He failed to acquire one, as Mr. Flores did not apply for the required Permit To Work until over 2 hours after the accident. The failure of Mr. Flores and Mr. Stokes to obtain a valid Permit To Work was the first of many breaches of Hercules' policies.

Next, Mr. Stokes, Mr. Flores, and the plaintiffs had a written and oral job safety analysis. The written JSA states that its purpose is to "evaluate the risks associated with the job." However, the JSA makes no mention of Hercules' factual contention that the crane operator had limited visibility due to his position above the water and the lighting. Additionally, the JSA never mentioned the potential risk of landing the basket at the wrong

time.

Hercules also had in place a safety measure that a "Weather Scorecard" should have been used prior to the personnel basket transfer on September 26, 2012. Specifically, the Hercules Weather Scorecard states that it "shall be used along with Job Safety Analysis and Permit To Work for Personnel Transfers." The Weather Scorecard assists the crane operating in evaluating the environmental conditions at the time of the lift such as the waves, winds, currents, visibility and time of day. Despite Hercules' mandate that the Weather Scorecard "shall" be used, Mr. Flores and Mr. Stokes failed to use a Weather Scorecard. In fact, a Weather Scorecard was not even present on the L/B TILAPIA on September 26, 2012.

Finally, as of September 2012, it was Hercules' policy that a "dry run" be completed prior to a personnel basket transfer taking place. The "dry run" is essentially a trial run of the actual personnel transfer. In the case of the personnel transfer at issue here, it was Hercules' policy that Mr. Flores was supposed to swing the basket over the side of the L/B TILAPIA and lower it to the crew boat, without passengers, to make sure he could perform the lift properly. In this instance, Mr. Flores failed to perform a "dry run."

**Actions of Mr. Flores**

Mr. Flores was a crane operator who was trained pursuant to the API-RP-2D May 2007 Sixth Edition as Class A Offshore Pedestal Crane Operator. As a Class A operator, Mr. Flores was qualified to perform a personnel transfer using a collapsible basket, such as the transfer performed on September 26, 2012. As the crane operator, Mr. Flores is always the leader of the lift team. As the lift team leader, Mr. Flores assumes ultimate responsibility for the safe operation of the crane. Part of his responsibility for safely operating the crane

includes gently landing the basket on the deck of the M/V SUN RAY, then placing enough slack in the crane line to account for the vertical movement in the deck of the crew boat so that the basket maintains contact with the deck of the crew boat. In this case, Mr. Flores failed to put enough slack in the crane line to allow it to stay on the deck of the vessel. Then, when the basket lost contact, Mr. Flores likely tried to correct the problem and let out crane line, but over compensated and "dropped the basket" then tried to correct that condition and lifted it off the deck again. Had Mr. Flores properly "set" the collapsible personnel basket on the deck of the M/V SUN RAY, it never would have broken contact with the deck of the vessel, which inevitably moves up and down in the seas.

It is undisputed that Mr. Flores was responsible for ensuring several safety aspects of the job, many of which were discussed above, one of the most important of which was holding a verbal JSA with the M/V SUN RAY. In that JSA, which occurred over the radio, Mr. Flores discussed with the crew the wind speed, the waves, and the current. Mr. Flores and the boat crew also agreed to accomplish the personnel basket transfer on the port side of the L/B TILAPIA. However, Mr. Flores did not tell the captain that he could not see the sea conditions nor did he discuss when the basket would land – whether it be the trough or swell of a wave. These instructions would have been prudent because Mr. Flores had never conducted a personnel basket transfer to the M/V SUN RAY before.

Mr. Flores confirmed the following conditions were present at the time of the transfer: (1) there was sufficient lighting; (2) it was not too early in the morning to perform the transfer; (3) the deck of the M/V SUN RAY was clear; (4) he assessed that the M/V SUN RAY was able to hold its position for the transfer; (5) he was able to see the deck of the M/V SUN RAY moving up and down in the seas which is important for him because he has to

time the landing of the basket; and (6) he made a safe landing of the basket in the middle of the M/V SUN RAY's deck. Despite all of this, Mr. Flores failed to put enough slack in the crane line, ultimately causing the basket to break contact with the deck of the M/V SUN RAY. The only person who was able to physically put slack in the line of the crane and properly set the basket was Mr. Flores. His failure cannot be blamed on anyone else.

After the incident, Mr. Flores never returned to the L/B TILAPIA and was notified that Chevron did not want him in the field anymore.

**The Actions of the crew of the SUN RAY:**

There were two people on watch aboard the M/V SUN RAY at the time of the incident: Captain Nguyen and deckhand Timothy Sykes. While one plaintiff, Mr. Derouen, states that the M/V SUN RAY was having trouble holding its position, that testimony is contradicted by every other witness. Particularly, every witness, including the crane operator will testify that the M/V SUN RAY was able to "maintain station" under the personnel basket to receive the transfer. Accordingly, Captain Nguyen properly discharged his obligation to operate the vessel.

The only other person on board the vessel at that time was deckhand Mr. Sykes. Mr. Sykes' only involvement in the operation was to signal the crane operator to stop the basket 12' above the water so that the vessel could back under it. Then, Mr. Sykes was to signal him to lower the load once the basket was over the deck of the M/V SUN RAY. Mr. Sykes was then able to grab the tag line hanging down to the deck of the vessel and then work his way up to grabbing the bottom of the basket. Mr. Sykes properly discharged all of his duties and the basket made an initial safe landing.

**Root Cause Analysis of Hercules**

After the incident, Hercules assembled a well-qualified, five person "Investigation Team" to determine what caused the incident and how to prevent it. That team included the following Hercules' employees:

(1) **Byron Allemand – Directing Manager of Hercules Liftboats – 6 years of vessel operations; incident investigations;**

(2) **Jeff Jared** – Vessel Manager of Hercules Liftboats, Operations and Tilapia Asset Manager, 4 years of incident investigations;

(3) **Stephen Barber**, HSE Manager, Hercules Liftboats, Formal Tap Root Training, 17 years in industry, participating/leading 50+ incident investigations;

(4) **Teryl Ryder**, Marine Operations Manager, Hercules Liftboats, 19 years of Oil & Gas/Marine Industry – Management experience and leading/participating in incident investigations.

(5) **Jacob Comeaux** – Regulatory Analyst, Hercules Liftboats, first formal inclusion with an incident investigation.

This impressive "Investigation Team" touted 46 years of industry and incident investigation experience. Mr. Barber and his team investigated and analyzed this incident and determined the "root causes," or, in layman's terms, what went wrong to cause the incident. The Incident Investigation Team reported that the JSA failed to identify one of the potential hazards of the job, and that a "dry run" (which was not done) would have allowed for assessment of the occasional swell. Additionally, the Team reported that Hercules' employees violated two of Chevron's 10 safety tenets: (1) failing to "Always follow safe work practices and procedures;" and (2) "Always follow written procedures for high-risk transfer or unusual situations." The Investigation Team also reported that "when a vessel moves into position for boarding/off boarding the ability to maintain station is critical." However, the

Investigation Team reported, in multiple places, that "the motor vessel was able to maintain station." In sum, the team recommended that the Captain and Crane Operator of the L/B TILAPIA be provided progressive discipline/accountability for "not following known procedures." The team also advised that these findings be shared with other Hercules personnel during an October 26, 2012 Team/Leadership meeting with Hercules Field personnel to reinforce "JSA, PTW, Dry Run and Weather score card expectations." Nowhere does the Hercules Incident Investigation report or the October 26, 2012 presentation document represent that the crew of the M/V SUN RAY did anything out of the ordinary or failed to follow any procedures.

**Conclusion**

Y&S's only involvement in this matter is that it was the designated landing area for a personnel basket transfer that went wrong. Had the plaintiffs properly disembarked the basket, the incident would never have occurred. Clearly, since the plaintiffs were not employed nor trained by Y&S, there is no credible argument that Y&S has any liability for the plaintiffs' failure to properly disembark the basket. In the alternative, should the Court find that the plaintiffs were not solely responsible for this incident, Y&S was not negligent for the personnel basket breaking contact with the deck of the M/V SUN RAY. The basket could only have broken contact in two ways: (1) the crane operator prematurely picked up the personnel basket; or (2) the basket did not have enough slack to maintain contact with the deck of the boat when it rose and fell in the seas. Regardless of which scenario is ultimately determined by the Court to be the cause of the air gap between the personnel basket, it cannot be credibly argued that the captain or the deckhand of the M/V SUN RAY had any responsibility for causing the air gap.

VII.

**UNCONTESTED OR STIPULATED MATERIAL FACTS**:

(1) At all times relevant herein, the BM3 - Oscar fixed platform was located in Bay Marchand Block 3 at coordinates North 29 04 19 and West 90 11 21.

(2) At all times relevant herein, the BM3-Oscar platform was located 3.1 nautical miles from the No. 6 Belle Pass sea buoy.

(3) At all times relevant herein, the top deck of the BM3 Oscar platform was 35' above the water surface.

(4) At all times relevant herein, the water depth at the BMO 3 Oscar platform was reported as 26' on the Chevron diagram of the platform and depth varies between an average of 25 to 30 feet.

(5) At all times relevant herein, the dimensions of the upper deck of the BM3 Oscar platform were 111' by 40'.

(6) At all times relevant herein, the CSI offshore weather station located in South Timbalier Block 52 it is approximately 21.2 nautical miles away from the BM3 Oscar platform. The water depth at this location is approximately 65 feet.

(7) At all times relevant herein, the ST 52 CSI weather station was 21 nautical miles away from sea buoy No. 6 at Belle Pass.

(8) At all times relevant herein, the dimensions of the M/V Sun Ray, a US Flag vessel, are 65' x 17' with a draft of 4.6' amidship.

(9) At all times relevant herein, the operator's seat located on the portside crane of the Tilapia was 95 inches above the deck of the vessel (90 inches without the seat cushion).

(10) At all times relevant herein, the pedestal of the portside crane of the Tilapia was 57 inches from the portside rail.

(11) At all times relevant herein, the pedestal of the portside crane of the Tilapia was 48 inches in diameter.

(12) At all times relevant herein, the gangway or ramp that extended from the Tilapia to the fixed platform was 12' long.

(13) At all times relevant herein, Y & S Marine, Inc., a corporation chartered under Louisiana law and domiciled in Louisiana, was the bareboat charterer and operator of the crew boat, the M/V Sun Ray.

(14) At all times relevant herein, Tho Duc Nguyen a/k/a Tho Duke Nguyen and Timothy Sykes, respectively the captain and deckhand of the M/V Sun Ray, were in the course and scope of employment with Y & S Marine, Inc.

(15) With the consent of the parties, Y & S Marine, Inc. and Sun Boats, Inc. withdrew their defense of limitation of liability.

(16) At all times relevant herein, Samsung Fire & Marine Insurance Company (Samsung Fire & Marine Insurance Co., Ltd.), a named defendant, had in full force and effect a policy of liability insurance insuring Y & S Marine, Inc. and Sun Boats, Inc. with limits of coverage of one million dollars ($1,000,000.00). No "reservation of rights" letter has been issued.

(17) In consideration of the withdrawal of the defense of limitation by Y & S Marine, Inc., and Sun Boats, Inc., and other stipulations reached herein, Jason Derouen, Lollo Francis III, and Nathaniel Parker agreed to voluntarily dismiss without prejudice (non-suit) their complaints against Tho Duc Nguyen

a/k/a Tho Duke Nguyen and Timothy Sykes. Said dismissals in no way effect complainants' rights against the remaining parties and their insurers.

(18) At all times relevant herein, Hercules Liftboat Company, LLC, a named defendant herein, is a limited liability company chartered under the laws of Delaware and doing business in Louisiana. At all times relevant herein, it owned and operated the Lift Boat Tilapia. Richard Flores, the crane operator on the morning of September 26, 2012, was in the course and scope of employment with said defendant.

(19) Hercules Liftboat Company, LLC withdrew its defense of limitation of liability.

(20) In consideration of the withdrawal of the defense of limitation of liability by Hercules Liftboat Company, LLC and other stipulations reached herein, Jason Derouen, Lollo Francis III, and Nathaniel Parker agreed not to name Richard Flores as a defendant.

(21) The accident of September 26, 2012, a subject of this litigation, occurred within the territorial waters of the State of Louisiana.

(22) At the time of the subject incident, plaintiffs were employed by Grand Isle Shipyard. They are not seamen.

(23) At all times relevant herein, Tho Duc Nguyen was an experienced and licensed USCG Merchant Mariner/Captain. He was qualified to operate the M/V Sun Ray

(24) At all times relevant herein, Christopher Stokes was an experienced and licensed USCG Merchant Mariner/Captain. He was qualified to operate the

Liftboat Tilapia.

**CONTESTED ISSUES OF FACT**:

(1) The extent of natural lighting conditions at the time of accident.

(2) Whether the crane operator's ability to monitor sea conditions was diminished by darkness.

(3) Whether the crane operator's ability to monitor sea conditions was diminished by his height above the water's surface .

(4) Whether the crane operator's ability to monitor seas/swells approaching the stern on the M/V Sun Ray was completely obstructed because they were moving towards the stern of the M/V Sun Ray from under the fixed platform and the adjacent elevated Tilapia.

(5) Whether the crane operator informed the captain and/or deckhand of the M/V Sun Ray of his inability to monitor and evaluate the seas approaching the stern of the M/V Sun Ray.

(6) Whether the crane operator should have informed the captain and/or deckhand of the M/V Sun Ray of his inability to monitor and evaluate the seas approaching the stern of the M/V Sun Ray.

(7) Whether the captain and/or deckhand of the M/V Sun Ray knew or should have known that the crane operator was relying upon the crew of the M/V Sun Ray to monitor the seas approaching the Sun Ray from its stern.

(8) Whether the safe and proper method to be followed when implementing a personnel basket transfer to a moving vessel is to time the initial contact between the descending basket and the stern deck of a "receiving" vessel

when its stern is in the trough of a wave.

(9) Whether the deckhand (Sykes) of the M/V Sun Ray intentionally timed the initial contact between the personnel basket and the stern deck of the M/V Sun Ray when its stern was rising in the seas and on or near the crest of a wave.

(10) Whether the deckhand (Sykes) of the M/V Sun Ray carelessly mistimed the initial contact between the personnel basket and the stern deck of the M/V Sun Ray when its stern was rising in the seas and riding the crest of a wave.

(11) Whether the deckhand (Sykes) believed that the standard to be followed was to time the initial contact between the personnel basket and the stern deck of the M/V Sun Ray when its stern was rising in the seas and riding the crest of a wave.

(12) Whether the proper and safe practice to be followed when implementing a personnel basket transfer to the stern of a moving vessel was to do so not only when the "receiving" vessel's stern was in the trough of a wave but also when the swell striking or raising the vessel's stern was on the low end of a swell train.

(13) Whether the crew of the M/V Sun Ray knew that the proper and safe practice to be followed when implementing a personnel basket transfer to the stern of a moving vessel was to do so not only when the "receiving" vessel's stern was in the trough of a wave but also when the swell striking or raising the vessel's stern was on the low end of a swell train.

(14) Whether Y & S management properly trained and/or instructed its deckhand

Sykes regarding the proper timing of the initial contact of a descending personnel basket with the stern of its crew boats.

(15) Whether a swell train of 2-3 foot seas is characterized by one or more swells below two feet and one or more swells greater than three feet.

(16) Whether (Sykes) was knowledgeable about the fact that sea conditions of 2-3 feet presented a pattern or swell train such that one or more waves would exceed three feet.

(17) Whether Sykes, the deckhand of the M/V Sun Ray, or Flores, the Hercules crane operator, had the responsibility under the circumstances to monitor the swells approaching the stern of the M/V Sun Ray.

(18) Whether Sykes, the deckhand of the M/V Sun Ray, or Flores, the Hercules crane operator, had the responsibility under the circumstances to implement a safe initial contact between the personnel basket and the M/V Sun Ray.

(19) Whether the proximity of the M/V Sun Ray to the leg of the Tilapia at the time of the personnel basket transfer adversely affected Captain Tho Nguyen's ability to safely hold the position of the crew boat to receive the personnel basket.

(20) Whether the prevailing wind and sea conditions striking the stern of the M/V Sun Ray required Captain Nguyen to alter his throttle position from reverse to forward and back in order to hold his vessel in position to receive the descending personnel basket.

(21) Whether altering the throttle position of the M/V Sun Ray in the face of the prevailing wind and sea conditions increased the rise of the stern of the

vessel as it moved upward under the crest of a swell.

(22) Whether a greater than three foot air gap between the personnel basket and the stern of the M/V Sun Ray immediately ensued following initial contact between the basket and the deck of the crew boat because the initial contact occurred when the vessel's stern was riding the crest of a wave at the high end of a swell train.

(23) Whether Derouen ever had the opportunity to safely get off of the personnel basket when it came into initial contact with the stern of the M/V Sun Ray or thereafter following the development of the initial air gap.

(24) Whether Francis ever had the opportunity to safely get off of the personnel basket when it came into initial contact with the stern of the M/V Sun Ray or thereafter following the development of the initial air gap.

(25) Whether Parker ever had the opportunity to safely get off of the personnel basket when it came into initial contact with the stern of the M/V Sun Ray or thereafter following the development of the initial air gap.

(26) Whether Lollo Francis lost his balance and fell off the basket as a result of untimely and forceful impacts between the basket and the stern deck of the M/V Sun Ray.

(27) Whether Nathaniel Parker lost his balance and fell off the basket as a result of untimely and forceful impacts between the basket and the stern deck of the M/V Sun Ray.

(28) Whether Jason Derouen lost his balance and fell into the net as a result of untimely and forceful impacts between the basket and the stern deck of the

M/V Sun Ray.

(29) Whether a larger vessel should have been requested by Captain Nguyen and/or the crane operator based upon the prevailing sea and wind conditions.

(30) Whether or not Y&S Marine, Inc. was negligent, and whether this negligence was the proximate cause of each plaintiff's injuries.

(31) Whether or not Hercules' liftboat was negligent, and whether this negligence was the proximate cause of each of plaintiffs' injuries.

(32) Whether or not Y & S Marine Inc. was obligated to follow the safety standards set forth in the Chevron Contractor's Handbook.

(33) Whether the captain and/or deckhand of the M/V Sun Ray knew or should have known that the crane operator’s ability to monitor and/or evaluate the effects of the wind, sea condition and current as they impacted the stern of the M/V Sun Ray was diminished or restricted;

(34) Whether the captain and/or deckhand of the M/V Sun Ray knew or should have known that the crane operator’s ability to monitor and/or evaluate the sea conditions was diminished by his height above the water’s surface and the fixed position in which he was situated in the crane’s seat at the time of the transfer in question;

(35) Whether the captain and/or deckhand of the M/V Sun Ray knew or should have known that the crane operator’s ability to monitor and/or evaluate seas/swells approaching the stern of the M/V Sun Ray was completely obstructed because these sea conditions were moving towards the stern of the M/V Sun Ray from underneath the fixed platform and the adjacent

elevated Tilapia;

(36) Whether the crane operator informed the captain and/or deckhand that due to his obstructed/limited vision that he was relying upon the deckhand for signals when landing the personnel basket on the deck of the M/V Sun Ray;

(37) Whether the captain and/or deckhand of the M/V Sun Ray were at the best vantage point to determine the variable weather conditions and its effect on their vessel;

(38) Whether the captain and/or deckhand of the M/V Sun Ray were in the best position to observe the exact wave cycle prior to the personnel basket making contact with its vessel;

(39) Whether the deckhand of the M/V Sun Ray was the designated signalman;

(40) Whether the deckhand of the M/V Sun Ray knew that he was acting as the designated signalman on this particular transfer;

(41) Whether the Hercules and Y&S JSA considered that the deckhand would act as the designated signalman;

(42) Whether the crane operator properly followed all signals provided by the deckhand/designated signalman;

(43) Whether the deckhand of the M/V Sun Ray should be monitoring the wave cycle to ensure that he is timing the landing of the personnel basket at the optimal time in the trough of a wave;

(44) Whether the captain of the M/V Sun Ray can alter the normal vertical rise and fall of the stern deck when he operates the vessel in rapid changes of reverse-neutral-forward or forward-neutral-reverse;

(45) Whether the crane operator would be reliant on the deckhand of the M/V Sun Ray to properly time the final descent signal with the incoming wave cycle, as the crane operator could not accurately assess the incoming sea conditions impacting the stern of the M/V Sun Ray;

(46) Whether the visual obstruction caused by the fixed platform and Tilapia as to the incoming wave cycle acted as a blind spot for the crane operator;

(47) Whether the decision of the captain of the M/V Sun Ray to position the port stern of the M/V Sun Ray to within 10 feet of the leg of the Tilapia and 15 feet of the closest side of the fixed platform was unsafe;

(48) Whether the captain of the M/V Sun Ray had to constantly adjust the engine power and/or the rotational direction of the propellers in order to neutralize the effects of the sea condition's forces on his vessel;

(49) Whether the captain of the M/V Sun Ray actions to maintain station in close quarters added an additional source of rise and fall of the stern of the vessel which cannot be predicted and increases the likelihood of injury during the personnel transfer process;

(50) Whether the personnel basket completely collapsed during this transfer incident;

(51) Whether the actions of the captain of the M/V Sun Ray compounded the speed and/or height of the vertical rise and fall of the stern deck which would have intensified any impact between the personnel basket and the M/V Sun Ray;

(52) Whether the crane in question has enough speed to keep up with a vessel

falling in a wave;

(53) Whether the captain and/or deckhand of the M/V Sun Ray could have positioned its vessel farther out which would have provide the captain with a larger space to maintain station;

(54) Once the deckhand of the M/V Sun Ray gave the final descent signal to the crane operator to make initial contact with the deck of his vessel, whether the crane operator had sufficient time to respond to the movement of the M/V Sun Ray;

(55) Whether the captain of the M/V Sun Ray advised the crane operator that he could maintain a proper position for the transfer;

(56) Whether the captain of the M/V Sun Ray failed to perform a pre-test (in violation of Y&S' policies and procedure) to determine if his vessel could maintain position in the approximate area that the lift was to take place;

(57) Whether the plaintiffs were properly trained to make a personnel basket transfer onto the deck of a receiving vessel;

(58) Whether the passengers of a personnel basket transfer are required to keep their knees flexed and back straight when being lowered to the receiving vessel;

(59) Whether the passengers of a personnel basket transfer are required to step off the flotation ring with one foot and then the other, once the flotation ring makes contact with the deck of the receiving vessel;

(60) Whether the passengers of a personnel basket transfer are required to walk away and not return for baggage until the crane has stopped lowering the

personnel basket and it is under control;

(61) Whether the personnel basket made initial contact with the stern deck of the M/V Sun Ray at the top of a swell or at some other point/time;

(62) Whether the plaintiffs were trained to immediately step off the personnel basket upon it making contact with the receiving vessel;

(63) Whether the actions/inactions of the captain and/or deckhand of the M/V Sun Ray during the personnel basket transfer caused the incident in question;

(64) Whether the plaintiffs had sufficient time to quickly and safely get off the personnel basket when it made initial contact with the deck of the M/V Sun Ray;

(65) Whether the Chevron/Y&S Charter Agreement obligates Y&S Marine to the following:

A. Y&S Marine is solely responsible for the operation, navigation and management of the Vessel.

B. The Master must carry out his or her duties with the utmost dispatch during the day and night as required by Company and supervise the Vessel's officers and crew as is customarily required.

C. The Master in charge of the Vessel shall have complete authority and responsibility to make all decisions concerning the suitability of weather, navigation, anchorage/docking facilities, seaworthiness of the Vessel, loading of the Vessel, sea-

fastening, and discharge of cargo, the manner of operation, and all other factors affecting safe operations of the Vessel.

D. The Master shall be solely responsible for determining whether the Services may be performed safely taking into consideration existing weather conditions and shall stop the work if he deems it Insafe to proceed with the Services.

E. The Master shall supervise and control the performance of loading, stowing, trimming and discharging of cargo.

F. The Master shall instruct, as a minimum, all such persons on the safest procedure and timing to embark or disembark the vessel.

(66) Whether or not the Plaintiffs were negligent and whether this negligence was the proximate cause of the plaintiffs' injuries;

(67) Whether the actions/inactions of the passenger/plaintiffs contributed or caused the incident;

(68) Whether the actions/inactions of the captain and/or deckhand contributed or caused the incident;

(69) Whether the actions/inactions of the crane operator contributed or caused the incident;

(70) Whether, at the time of the transfer, the crane operator's perception-reaction time is further diminished due to the darkness, reflections from the multiple lights on the different structures/vessels, and being positioned approximately 45 to 50 feet above the water's surface;

(71) The wave height at the time of the personnel basket transfer on September 26, 2012;

(72) The extent of the vertical movement of the deck of the M/V SUN RAY at the time of the personnel basket transfer on September 26, 2012;

(73) The make and model of the four man collapsible personnel basket used to perform the personnel basket transfer on September 26, 2012;

(74) Whether the personnel basket made an initial “safe landing” on the deck of the M/V SUN RAY on September 26, 2012 sufficient for the riders to safely disembark;

(75) Whether the sea conditions at the time of the personnel basket transfer were within the range of safe operations;

(76) Whether the light conditions at the time of the time were in safe operating conditions;

(77) Whether the September 26, 2012 incident alleged by the plaintiffs was an unavoidable incident;

(78) Whether the plaintiffs were trained on how to properly ride a personnel basket prior to the personnel basket transfer of September 26, 2012;

(79) Whether the plaintiffs were trained to step off the personnel basket quickly

(80) What type of training was received by the plaintiffs prior to the personnel basket transfer of September 26, 2012;

(81) The duties and responsibilities of the plaintiffs as riders of the personnel basket during the personnel basket transfer;

(82) Whether any of the plaintiffs failed to perform their duties and/or

responsibilities during the personnel basket transfer;

(83) Whether any of the plaintiffs should have exercised stop work authority on September 26, 2012;

(84) If the plaintiffs failed to perform their duties and/or responsibilities during the personnel basket transfer, whether that was a cause of the incident;

(85) Whether the light conditions at the time of the personnel basket transfer were within normal operating conditions;

(86) Whether the crane operator's distance from the surface of the water was within normal operating conditions;

(87) Whether the crane operator's view of the water was within normal operating conditions;

(88) Whether the crane operator's view of the M/V SUN RAY was within normal operating conditions;

(89) If the crane operator's ability to monitor the sea conditions was diminished at the time of the personnel basket transfer, whether the crane operator should have utilized stop work authority;

(90) Whether the crane operator could see the destination of where the personnel basket was to land on the deck of the M/V SUN RAY;

(91) Whether the crane operator is responsible for properly timing the landing of the personnel basket on the deck of the M/V SUN RAY;

(92) Whether the crane operator is responsible for ensuring that enough slack is placed in the crane line so that the personnel basket does not break contact with the deck of M/V SUN RAY;

(93) Whether a designated signalman was required for this personnel basket transfer;

(94) Whether the crane operator properly timed the landing of the personnel basket on the deck of the M/V SUN RAY;

(95) Whether the crane operator placed enough slack in the crane line to ensure that the personnel basket stayed on the deck of the M/V SUN RAY;

(96) Whether Hercules required a valid Permit To Work prior to a personnel basket transfer taking place;

(97) Whether a valid Permit To Work was issued prior to the personnel basket transfer;

(98) Whether the incident was cause by the crane operator, Flores', improper timing of landing the basket on the deck of the M/V SUN RAY;

(99) Whether the crane operator failed to follow safe work practices when performing the personnel basket transfer;

(100) Whether the crane operator failed to follow procedures when performing the personnel basket transfer;

(101) Whether timing the landing of the basket at the crest of a wave complies with industry standards;

(102) Whether the crane operator was properly trained to the applicable API RP 2D standards;

(103) Whether Hercules conducted a root cause analysis of the incident;

(104) Whether Hercules provided a root cause analysis of the incident to

Chevron;

(105) Whether the crane operator, Flores, was the person in charge (“PIC”) during the personnel basket transfer;

(106) Whether the deckhand, Sykes, was the designated signalman of the personnel basket transfer;

(107) Whether the crane operator has a responsibility to ensure that there is sufficient lighting for safe operation before commencing a personnel basket transfer;

(108) Whether the crane operator has the responsibility to stop any lift operation that he deems unsafe;

(109) What role, if any, a signalman plays in the timing of the landing of the personnel basket on the deck of a vessel;

(110) Whether Hercules required its crane operators to perform a “dry run” prior to a personnel basket transfer taking place;

(111) Whether a the crane operator, Flores, performed a “dry run” prior to the personnel basket transfer of the plaintiffs on September 26, 2012;

(112) Whether the M/V SUN RAY was able to maintain station to receive the personnel basket transfer from the L/B TILAPIA;

(113) Whether the crane operator is the person in charge of a personnel basket transfer;

(114) Whether the basket made an initial safe landing on the deck of the M/V SUN RAY;

(115) Whether the crane operator, Flores, properly communicated with the crew of the M/V SUN RAY;

IX.

**CONTESTED ISSUES OF LAW**

(1) Whether there exists a legal standard on when to time the landing of a collapsible personnel basket when a personnel transfer is performed from a liftboat to a crew boat?

X.

**DESCRIPTION OF EXHIBITS INTENDED TO BE INTRODUCE AT TRIAL**

**A. THE FOLLOWING EXHIBITS WILL BE ADMITTED WITHOUT OBJECTION:**

(1) Eight aerial photographs showing the BM3-Oscar platform or sections thereof.

(2) Diagram of accident scene (depicting sketch of platform, liftboat, and crew boat with wind and wave information) prepared by Captain Nguyen.

(3) Chevron Contractor's Hand Book - sections 1, 2 &7and in particular page 63, and section R2, B3 and B4.

(4) Chevron Personnel Basket and swing rope safety (Revision 102, August 2002).

(5) USCG certificate of inspection for the M/V Sun Ray.

(6) USCG certificate of documentation for the M/V Sun Ray.

(7) Master Time Charter between Chevron & Y&S Marine, dated April 12, 2012.

(8) Y & S Marine's Sun Ray crew boat details (2 pgs.).

(9) Photographs of the M/V Sun Ray port side view.

(10) Selected photographs of the stern deck and stern controls of the M/V Sun Ray.

(11) Selected photographs of the liftboat Tilapia.

(12) Video of the L/B Tilapia showing the crane in use lowering a personnel basket.

(13) Daily Master's Log of the M/V Sun Ray 9/26/12.

(14) Daily JESA Meeting Form.

(15) Job Environmental and Safety Analysis prepared by Y & S Marine.

(16) Y & S Accident/Incident Report form signed by Jason Derouen.

(17) Y & S Accident/Incident Report form signed by Lollo Francis, III.

(18) Y & S Accident/Incident Report form signed by Nathaniel Parker.

(19) Report entitled " Y & S Marine, Inc. Incident/Investigation- personnel basket"- two typed pages.

(20) Lift Boat Tilapia Bird's eye view diagram.

(21) Lift Boat Tilapia specifications.

(22) Liftboat Tilapia Specifications for 30 ton crane.

(23) Hercules, Tilapia, Class 120 liftboat details including 30 ton crane load chart (4 pgs. ).

(24) Daily liftboat Log of Tilapia for 9/26/12.

(25) Hercules JSA 9/26/12.

(26) Hercules permit to work 9/26/12 - 1534-12-266.

(27) Hercules Daily Safe Operation Plan.

(28) Hercules Injury/illness Incident report (two pgs).

(29) Picture of Tilapia showing port and starboard crane.

(30) Photographs of Tilapia showing " circled" crane operator's chair

(31) Fifteen photographs of the Tilapia's deck (or portions thereof) including the port side crane.

(32) Three photographs of the Tilapia's gangway.

(33) Twenty - Seven three dimensional "to scale" drawings prepared by Audubon Engineering of the accident scene showing the fixed BM3-O platform, the adjacent jacked up liftboat Tilapia, and the M/V Sun Ray at several different locations with the port side crane boom extended over the water with the personnel basket descending to the stern deck of the M/V Sun Ray. The drawings show several angles and lateral swings of the boom corresponding with the position of the M/V Sun Ray. A computer disk is included allowing variations in the position of the M/V Sun Ray and the crane boom.

(34) Certified copy of Samsung policy of insurance.

(35) GIS Employee Accident Statement prepared by Derouen.

(36) GIS Employee Accident Statement prepared by Francis.

(37) GIS Employee Accident Statement prepared by Parker.

(38) Y&S Daily JESA Meeting Form (2 pages).

(39) Hercules/GIS Access Agreement.

(40) Chevron Gulf of Mexico Business Unit Annual Inspection Report for "SUN RAY" dated 07/20/2012;

(41) Billy Pugh Co., Inc., Certificate of Verification to Model X-870 bearing serial No. 1112-11 to 1116-11;

(42) GOM Liftboat Minimum Operating Standards;

(43) Billy Pugh Co. Personnel Basket Dimensions;

(44) Section 1.1.2 Y&S Marine Weather Guidelines and Weather Clearances (Policy Letter);

(45) Moxie Safe Personnel transfer to and from vessels - video.

(46) API RP 2d Standards 1972;

(47) Acknowledgment of Grand Isle Shipyard Swing Rope/Personnel Basket Safety Program executed by Lollo Francis;

(48) Acknowledgment of Grand Isle Shipyard Swing Rope/Personnel Basket Safety Program executed by Nathaniel Parker;

(49) Richard Flores Class A Certification;

(50) Hercules Injury and Illness Report completed by Flores and Stokes (Hand Written);

(51) Timothy Sykes "API-RP-2D 6th Edition" Rigging Certification and Evaluation;

(52) Timothy Sykes Y&S Certificates of Training (4 – 7/20/10, 3/31/11, 8/25/11, 1/25/12);

(53) Timothy Sykes Personnel Basket Safety Training Certificate issued by SCL Technical College;

(54) Timothy Sykes – Quiz Results on Personnel Basket Transfers;

(55) Capt. Tho Duke Nguyen Certificate of Completion for API RP 2D Edition 6 training;

(56) Capt. Tho Duke Nguyen Y&S Certificate of Training;

(57) Capt. Tho Duke Nguyen – Quiz Results on Personnel Basket Transfers;

(58) NWS NEXRAD Level II Radar Images, New Orleans, Louisiana (September 26, 2012).

(59) NOAA National Data Buoy Center- Louisiana/Mississippi Gulf Coast Region (September 26, 2012).

**B. The following exhibits are subject to objection to by the plaintiffs or one or more of the defendants as set forth below:**

(1) Correspondence to or from Grand Isle Shipyard relating to the September 26, 2012 incident;

This exhibit is offered by Y&S Inc. and its related parties. Objection is made by plaintiffs and Hercules on the grounds of lack of specificity, foundation, authenticity, hearsay and relevance

(2) Correspondence between Chevron and Hercules relating to the September 26, 2012 incident (Bate stamped No. CVX 0015- CVX 0020);

This exhibit is offered by Y&S and its related parties. Objection is made by plaintiffs and Hercules on the grounds of foundation, authenticity, hearsay and relevance.

(3) API RP 2d Standards 2007;

This exhibit is offered by Y&S and its related parties. Objection is made by Hercules Liftboat Company, LLC based on the lack of relevancy.

(4) Comet Wind and Wave Forecasting Aids Shallow Water Wave Calculator University Corporation for Atmospheric Research 2009.

This exhibit is being offered by plaintiffs. Objection is made by Y&S Marine, Inc. based on hearsay, foundation, relevancy and authenticity.

(5) Hercules ”Incident Investigation Report” (four pages);

This exhibit is offered by Y&S and its related parties. Objection is made by Hercules Liftboat Company, LLC. based on lack of foundation, relevancy, authenticity, and hearsay.

(6) Hercules Offshore RCA Review- Personnel Transfer.

This exhibit is offered by Y&S Inc. and its related parties. Objection is made by Hercules Liftboat, LLC on the basis of lack of foundation, authenticity, hearsay and relevance. In addition, this exhibit was not listed in the exhibit list filed by Y&S pursuant the Court's Scheduling Order (document 106).

(7) Hercules Weather Scorecard.

This exhibit is offered by Y&S Inc. and its related parties. Objection is made by Hercules Liftboat, LLC on the basis of lack of foundation, hearsay and relevance. In addition, this exhibit was not listed included in the exhibit list filed by Y&S pursuant the Court's Scheduling Order (document 106).

XI.

**DEPOSITION TESTIMONY TO BE OFFERED INTO EVIDENCE**

(1) Richard Flores
6226 Reamer St.
Houston, TX

(2) Christopher L. Stokes
8316 Willow Trace Loop W
Wilmer, AL

(3) Leslie Eschete, Expert
Eschette Marine Consultants, Inc.
4905 34th Street, South
Suite 247
St. Petersburg, Florida 33711

(4) Y&S Marine, Inc.
Through its designated corporate representative
Emmet "Trae" Scobel, III
Vice President
Y & S Marine, Inc.
Sun Boats, Inc.
138 Keating Dr.
Belle Chasse, LA 70037

Pursuant to FRCP 32(a) (3), the following pages will be offered into evidence from the corporate deposition of Y&S Marine, Inc. with Emmet "Trae" Scobel, III as

its corporate representative. (Pages cover page,1-,8 inclusive,13,23-27 inclusive, 124-127, 150, 151, Exhibits 1-3 i.e. Notices of Deposition and Subject Matter Listings).

XII.

**BRIEF DESCRIPTION OF CHARTS, DRAWINGS, GRAPHS**

(1) Plaintiffs may use drawings of the crane and the position of the boom over the water and the basket above the M/V Sun Ray. These drawing were prepared by Audubon Engineering.

(2) Y&S Marine, Inc. may use a diminutive scaled model of a X- 870 Billy Pugh basket.

(3) Y&S Marine, Inc. Animation of the personnel basket transfer specific to the facts of this case.

(4) The parties may use blow ups of any exhibit admitted into evidence.

XIII.

**Witness List:**

**A. Plaintiffs will call the following witnesses:**

**LIABILITY:**

(1) Jason Derouen
6717 Lee Station Road
New Iberia, LA 70560

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including weather and sea conditions, state of illumination, movement of the M/V Sun Ray during the vessel transfer including operation of the stern controls, actions of the crane operator and crew of the M/V Sun Ray (captain and deckhand), orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure, elevation of

the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impact(s) on the plaintiff and his observations of the effect of basket to deck impacts on the movements of the other two men on the basket, vessel movement in the seas generally and added vessel movement caused by reverse to forward changes in engine throttle position to hold the vessel in place, improper timing of the contact between the basket and the stern deck of the M/V Sun Ray creating an "air gap", contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave.

(2) Lollo Francis, III
300 Spruce Drive,
Apt. 156
Lafayette, LA 70506

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including weather and sea conditions, state of illumination, movement of the M/V Sun Ray during the vessel transfer including operation of the stern controls, actions of the crane operator and crew of the M/V Sun Ray (captain and deckhand), orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure, elevation of the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impact(s) on the plaintiff and his observations of the effect of basket to deck impacts on the movements of the other two men on the basket, vessel movement in the seas generally and added vessel movement caused by reverse to forward changes in engine throttle position to hold the vessel in place, improper timing of the contact between the basket and the stern deck of the M/V Sun Ray creating an "air gap", contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave.

(3) Nathaniel Parker
209 Bechet Rd.
Carencro, LA 70520

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including weather and sea conditions, state of illumination, movement of the M/V Sun Ray during the vessel transfer

including operation of the stern controls, actions of the crane operator and crew of the M/V Sun Ray (captain and deckhand), orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure, elevation of the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impact(s) on the plaintiff and his observations of the effect of basket to deck impacts on the movements of the other two men on the basket, vessel movement in the seas generally and added vessel movement caused by reverse to forward changes in engine throttle position to hold the vessel in place, improper timing of the contact between the basket and the stern deck of the M/V Sun Ray creating an "air gap", contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave.

(4) Richard Flores (by deposition)
Former crane operator for
Hercules Liftboats
6226 Reamer St.
Houston, TX

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including duty to conduct a dry run and perform a job safety analysis, weather and sea conditions, state of illumination, movement and angle of the crane boom during the personnel transfer, his actions, and the actions of the crew of the M/V Sun Ray (captain and deckhand), orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure, elevation of the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impacts on the plaintiffs, impairment of visibility due to darkness and inability to see approaching seas as they were moving towards the stern of the M/V Sun Ray from under the elevated fixed Chevron structure and adjacent lift boat, improper timing of the contact the basket and the stern deck of the M/V Sun Ray, contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reliance on the deckhand's signals and dependance on the crew of the crew boat to observe incoming wave action against the stern of the crew boat, reciprocal and separate duties of the crane operator and crew boat personnel. In general, this out of state witness' deposition will be used at trial.

(5) Christopher L. Stokes (by deposition)
Former Captain of the liftboat Tilapia
8316 Willow Trace Loop W
Wilmer, AL 36587

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including elevation of the Tilapia out of water, characteristics of the M/V Sun Ray especially as they affected a personnel basket transfer, weather and sea conditions, duty to conduct a dry run and pre- accident job safety analysis, post - accident investigation, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reciprocal and separate duties of the crane operator and crew boat personnel. In general, this out of state witness' deposition will be used at trial.

(6) Captain Tho Duke Nguyen
2820 Louise St.
Harvey, LA 70058

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including duty to conduct a dry run and perform a job safety analysis, weather and sea conditions, state of illumination, movement of the M/V Sun Ray during the vessel transfer, his actions, and the actions of the deckhand of the M/V Sun Ray, orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure (and reason for same), forces exerted against the stern of the M/V Sun Ray with corresponding engine throttle positions, distance of the stern of the M/V Sun Ray from the fixed platform and leg of the Tilapia at the time the basket came into contact with the stern deck of the M/V Sun Ray, elevation of the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impacts on the plaintiffs, observations of approaching seas as they were moving towards the stern of the M/V Sun Ray from under the elevated fixed Chevron structure and adjacent lift boat, lack of communication between the captain and crane operator regarding the crane operator's inability to see the approaching seas, improper timing of the contact between the basket and the stern deck of the M/V Sun Ray causing and unwanted "air gap", contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reciprocal and separate duties of the crane operator and crew boat personnel, post - accident statements and reports.

(7) Timothy L. Sykes
318 Guidry Rd.
Lafayette, LA 70503

Knowledge and training involving offshore personnel basket transfers, facts of the accident in general including duty to conduct a dry run and perform a job safety analysis, weather and sea conditions, state of illumination, movement of the M/V Sun Ray during the vessel transfer, his actions, and the actions of the captain of the M/V Sun Ray, orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure, forces exerted against the stern of the M/V Sun Ray, elevation of the Tilapia out of water, impact and contact(s) between the personnel basket and the stern deck of the crew boat, effect of the basket to deck impacts on the plaintiffs, observations of approaching seas as they were moving towards the stern of the M/V Sun Ray from under the elevated fixed Chevron structure and adjacent lift boat, communication/signals between the deckhand and crane operator, lack of communication regarding the crane operator's inability to see the approaching seas, improper timing of the contact between the basket and the stern deck of the M/V Sun Ray, contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, deckhand's error regarding timing of contact between the personnel basket and deck of his vessel, occurrence of "air gap" following basket to deck contact, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reciprocal and separate duties of the crane operator and crew boat personnel, post - accident statements and reports.

(8) Emmet "Trae" Scobel, III
Vice President
Y & S Marine, Inc.
Sun Boats, Inc.
138 Keating Dr.
Belle Chasse, LA 70037

Information acquired about the accident after the fact, post-accident report prepared and authored by Mr. Scobel, contract between Y & S and Chevron, obligation of Y & S to follow Chevron's safety practices, in particular the Chevron Contractor's Hand Book, in general and in particular page 63, and sections R2, B3 and B4, together with Chevron Personnel Basket on Swing Rope Safety (Revision 102, August 2002), proper and safe timing of personnel basket contact with the Y & S crew boat deck should have been when deck was in the trough of a wave, knowledge and training involving offshore personnel basket transfers, duty to conduct a dry

run and perform a job safety analysis, source of weather and sea conditions set forth in his report. Improper timing of the contact the basket and the stern deck of the M/V Sun Ray, contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reciprocal and separate duties of the crane operator and crew boat personnel.

(9) Dr. David L. Mitchell, Ph.D (expert)
Meteorologist/Wave Propergation Expert
GEO Associates
P. O. Box 70
Dayton, TX 77535

Time/onset of twilight and sunrise in Bay Marchand on September 26, 2012, meaning of these terms- wind conditions and sea state at the time of the accident and the location of the accident, variations in wave height during a wave cycle, distension is wave charteristics and swell trains between the locations of South Timberlair 52 and Bay Marchand Block 3.

(10) Charles Nolan (expert)
Vessel Captain
Marine Safety
Vessel Operations
Breakwater Services, LLC
1714 Savoy Rd.
Youngsville, LA 70592

Knowledge and training involving offshore personnel basket transfers, and perform a proper job safety analysis, the effect of weather and sea conditions, state of illumination, and movement of the M/V Sun Ray during the vessel transfer, the responsibilities of the crew boat captain and deckhand and whether their actions were consistent with customary and prevailing safety practices including Chevron standards, the negligent actions of the deckhand of the M/V Sun Ray, orientation of the M/V Sun Ray to the Tilapia and adjacent fixed Chevron structure (and reason for same), forces exerted against the stern of the M/V Sun Ray with corresponding engine throttle positions, the unsafe "too close" distance of the stern of the M/V Sun Ray from the fixed platform and leg of the Tilapia at the time the basket came into contact with the stern deck of the M/V Sun Ray, the "bump effect" or vertical movement of the stern deck of the M/V Sun Ray caused by a change from "reverse engines" to "forward engines" and alteration of throttle position, mistimed and unsafe impact and

contact(s) between the personnel basket and the stern deck of the crew boat resulting in an unsafe and unwanted "air gap", duty to observe of approaching seas as they were moving towards the stern of the M/V Sun Ray from under the elevated fixed Chevron structure and adjacent lift boat. Lack of communication between the captain and crane operator regarding the crane operator's inability to see the approaching seas, improper timing of the contact the basket and the stern deck of the M/V Sun Ray, contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave, reciprocal and separate duties of the crane operator and crew boat personnel, variations in wave height during a series of waves within a swell train, duty to time initial contact between a basket and deck of a crew boat during a personnel transfer at the low end of a wave cycle, causes of the accident and the negligence of the crew boat captain, crew boat deckhand and crane operator.

(11) Any witness listed by any other party

**B. Hercules Liftboats, LLC, defendant, will call the following witnesses (to the extent not called and examined in Plaintiffs' case-in-chief):**

(1) Jason Derouen - 6717 Lee Station Road, New Iberia, LA 70560

On cross-examination to address knowledge and training with GIS and personnel basket transfers, the facts and circumstances surrounding the incident, and any other facts relevant to any issue before the Court.

(2) Lollo Francis, III - 300 Spruce Drive, Apt. 156, Lafayette, LA 70506

On cross-examination to address knowledge and training with GIS and personnel basket transfers, the facts and circumstances surrounding the incident, and any other facts relevant to any issue before the Court.

(3) Nathaniel Parker - 209 Bechet Road, Carencro, LA 70520

On cross-examination to address knowledge and training with GIS and personnel basket transfers, the facts and circumstances surrounding the incident, and any other facts relevant to any issue before the Court.

(4) Captain Tho Duke Nyguen - 2820 Louise Street, Harvey, LA 70058

Facts and circumstances surrounding the incident, operations of his vessel, duties/responsibilities of a captain/ deckhand, Y&S policies and procedures, training and any other facts relevant to any issue before the Court.

(5) Timothy L. Sykes - 318 Guidry Road, Lafayette, LA 70503

Facts and circumstances surrounding the incident, operations of his vessel, duties/responsibilities of a captain/deckhand, Y&S policies and procedures, training and any other facts relevant to any issue before the Court.

(6) Christopher Stokes (by deposition) - P.O. Box 261, Leroy, AL 36548

This witness is out of state and unavailable. Hence, he will testify by deposition which outlines the topic areas discussed and covered.

(7) Richard Flores (by deposition) - 6226 Reamer St., Houston, TX 77074

This witness is out of state and unavailable. Hence, he will testify by deposition which outlines the topic areas discussed and covered.

(8) Stephen A. Killingsworth - P.O. Box 81519, Lafayette, LA 70598

Will testify consistent with the observations/opinions/conclusions contained in his original and rebuttal reports in the field of mechanical engineering, crane operations and accident reconstruction; tests/calculations performed during the inspection of the Tilapia and video taken of same.

(9) Stephen Barber - 103 La Villa Circle, Youngsville, LA 70592

Y&S Marine wants to introduce a post-accident report that was prepared by this witness and label it a root cause analysis. However, his deposition testimony clearly establishes that his report is inaccurate, incomplete and unreliable for the trier-of-fact to rely upon when evaluating and determining the liability/fault issues in this matter. Hence, Hercules will call this witness if the report is introduced so that a proper foundation can be laid in order for the Court to determine what weight, if any, should be given based on the total circumstances.

(10) Eric J. Callais (individually and/or as designated corporate representative for GIS); Grand Isle Shipyard, Inc., 18813 Highway 3275, Galliano, LA 70354

Business records of GIS, the training of the plaintiffs, facts and circumstances surrounding the incident, training videos provided to plaintiffs on personnel basket transfers, and any other facts relevant to any issue before the Court.

(11) Kenneth LeBlanc (individually and/or as designated corporate representative for Chevron); Chevron USA, 4317 Ferry Road, Bourg, LA 70343

Facts and circumstances surrounding this incident, documents provided by Chevron to lay proper foundation, subject matters listed in the corporate NOD of Chevron, fact that Chevron never ran Flores off its job; fact that Flores worked for Chevron after the incident in question.

(12) Emmet "Trae" Scobel, III (individually and/or as designated corporate representative for Y&S Marine) - Sun Boats Inc., 138 Keating Drive, Belle Chasse, LA 70037

Information acquired about the accident after the fact, post-accident report prepared and authored by Scobel, Charter/contract between Y & S and Chevron, obligation of Y & S to follow Chevron's safety practices, in particular the Chevron Contractor's Hand Book, Chevron Personnel Basket on Swing Rope Safety, proper and safe timing of personnel basket contact with the Y & S crew boat deck should have been when deck was in the trough of a wave, knowledge and training involving offshore personnel basket transfers, duty to conduct a dry run and perform a job safety analysis, source of weather and sea conditions set forth in his report. Improper timing of the contact the basket and the stern deck of the M/V Sun Ray, contact occurred between the basket and the stern deck of the M/V Sun Ray when the vessel's stern was riding the crest of a wave, safe practice required contact between the personnel basket and the deck of the receiving vessel when its stern was in the trough of a wave.

**C. Y&S Marine, Inc., Sun Boats, Inc. and Samsung Fire and Marine Insurance Company, defendants, list the following witnesses (to the extent not called and examined in Plaintiffs' case-in-chief):**

(1) Lollo Francis
300 Spruce Drive
Apartment 156
Lafayette, Louisiana 70506

To testify about the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, his training, and any other facts relevant to any issues before the court.

(2) Nathaniel Parker
209 Bechet Road
Carencro, Louisiana 70520

To testify about the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, his training, and any other facts relevant to any issues before the court.

(3) Jason Derouen
6717 Lee Station Road
New Iberia, Louisiana 70560

To testify about the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, his training, and any other facts relevant to any issues before the court.

(4) Eric Callais
Grand Isle Shipyard, Inc.
18813 Highway 3275
Galliano, Louisiana 70502

To testify about business records of Grand Isle Shipyards, the training of the plaintiffs', training provided by Grand Isle Shipyards, correspondence to and from Chevron about the incident, and any other facts relevant to any issues before the court.

(5) Richard Flores (BY DEPOSITION)
6226 Reamer Street
Houston, Texas

To testify about his duties as the crane operator, the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, any discipline resulting from his involvement in the personnel basket transfer, his training, and any other facts relevant to any issues before the court.

(6) Capt. Christopher Stokes (BY DEPOSITION)
8316 Willow Trace Loop W
Wilmer, Alabama 36587

To testify about his duties as the captain of the L/B TILAPIA, the circumstances surround the personnel basket transfer on September 26, 2012, the issuance of a Permit To Work, any discipline he received as a result of his involvement in the alleged accident, his training, and any other facts relevant to any issues before the court.

(7) Capt. Tho Nguyen
2820 Louise Street
Harvey, Louisiana 70058

To testify about his duties as the captain of the M/V SUN RAY, the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, his training, and any other facts relevant to any issues before the court.

(8) Timothy Sykes
318 Guidry Road
Lafayette, Louisiana 70503

To testify about his duties as the deckhand on the M/V SUN RAY, the circumstances surround the personnel basket transfer on September 26, 2012, the alleged accident, his training, and any other facts relevant to any issues before the court.

(9) Byron Allemand
109 Maple Grove Lane
Youngsville, Louisiana 70592

To testify about his job at Hercules as of September 26, 2012, his role as the "Sponsor" of the Hercules Investigation Team who investigated the September 26, 2012 incident, the Incident Investigation Report issued by the Incident Investigation Team, the root cause analysis, any correspondence with Chevron about the incident, any discipline issued as a result of the Incident Investigation, Hercules' policies and procedures, and any other facts relevant to any issues before the court.

(10) Emmet "Trae" Scobel, III
138 Keating Drive
Belle Chasse, LA 70037

To testify about his position at Y&S Marine, Inc., his knowledge of the September 26, 2012 incident, Y&S Marine's policies and procedures, Y&S Marine's incident investigation in to the September 26, 2012 incident, correspondence between Y&S and Chevron, any other facts relevant to any issues before the court.

(11) Jeff Jared
215 Lodias Road
Lafayette, Louisiana 70508

To testify about his job at Hercules as of September 26, 2012, his role as the "Team Leader" of the Hercules Investigation Team who investigated the September 26, 2012 incident, the Incident Investigation Report issued by the Incident Investigation Team, the root cause analysis, any correspondence with Chevron about the incident, any discipline issued as a result of the Incident Investigation, Hercules' policies and procedures, and any other facts relevant to any issues before the court.

(12) Stephen Barber
103 La Villa Circle
Youngsville, Louisiana 70592

To testify about his job at Hercules as of September 26, 2012, his role as the "Lead RCA Facilitator" of the Hercules Investigation Team who investigated the September 26, 2012 incident, the Incident Investigation Report issued by the Incident Investigation Team, the root cause analysis, any correspondence with Chevron about the incident, any discipline issued as a result of the Incident Investigation, Hercules' policies and procedures, and any other facts relevant to any issues before the court.

(13) Terrel Ryder
1202 Marcia Avenue
Abbeville, Louisiana 70510

To testify about his job at Hercules as of September 26, 2012, his role as a "Team Leader" of the Hercules Investigation Team who investigated the September 26, 2012 incident, the Incident Investigation Report issued by the Incident Investigation Team, the root cause analysis, any correspondence with Chevron about the incident, any discipline issued as a result of the

Incident Investigation, Hercules' policies and procedures, and any other facts relevant to any issues before the court.

(14) Kenneth LeBlanc
Chevron USA
4317 Ferry Road
Bourg, Louisiana 70343

To testify about his job at Chevron as of September 26, 2012, the policies and procedures of Chevron, the Chevron contractor handbook, correspondence between Chevron and Hercules, business records of Chevron related to the September 26, 2012 incident, any other facts relevant to any issues before the court.

(15) Robert Borison, Expert
215 East Second Street
Unit 1
Pass Christian, Mississippi 39571

To testify as an expert witness in the fields of crane operations and marine safety.

(16) Scott McClure, Expert
Alan C. McClure Associates, Inc.
2929 Briarpark Drive, Suite 220
Houston, Texas 77042

To testify as an expert witness in the fields of naval architecture, vessel stability, vessel maneuvering and response, and dynamic motions.

(17) Leslie Eschete, Expert (By deposition)
Eschette Marine Consultants, Inc.
4905 34th Street, South
Suite 247
St. Petersburg, Florida 33711

To testify as an expert witness in the field of vessel operations.

(18) Yiefi Philip Chu, Ph.D., Expert
126 Silverwood Drive
Slidell, Louisiana 70461

To testify as an expert witness in the field of oceanography.

XIV.

**JURY/NON-JURY TRIAL**

This is a bench trial.

XV.

**BIFURCATION OF TRIAL**

Pursuant to an order previously enter by this Honorable Court, this matter is being tried on liability only. The trial commences on September 21, 2015 at 9:00 a.m.

XVI.

**OTHER MATTERS**

(1) Hercules Liftboat Company, LLC filed in this proceeding a copy of the Notice of Bankruptcy and Interim Order issued by the United States Bankruptcy Court in Delware in connection with the Petition for bankruptcy that it filed with the United States Bankruptcy Court in Delware. These documents are listed as 138-1 and 138-2 in this proceeding. The order of the Bankruptcy Court exempted this matter from the automatic stay provision of the United States Bankruptcy Code. However, there is a hearing scheduled on September 8, 2015 in the bankruptcy proceeding to afford creditors the opportunity to object to the interim order.

(2) The perpetuation deposition of Captain Leslie Eschete, an expert for Y&S Marine, Inc. is scheduled for September 4, 2015.

XVII.

**DATE AND LENGTH OF TRIAL**

Trial in this matter will commence on Monday, September 21, 2011 at 9:00 a.m. It is anticipated that trial will last three to four days.

XVIII.

**CERTIFICATE**

This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared in person or by telephone. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the court, or by order of the court to prevent manifest injustice.

XIX.

Possibility of settlement of this case was considered.

____________________
ELDON E, FALLON
United States District Judge

Respectfully submitted,

s/Daniel S. Foley
DANIEL S. FOLEY (#5632)
Barker Boudreaux, Lamy & Foley
228 St. Charles Avenue, Suite 1110
New Orleans, LA 70130

s/Jason R. Kenney
Anthony J. Staines
Jason R. Kenney
Staines & Eppling, LPAC
3500 North Causeway Blvd.
Suite 820
Metairie, LA 70002

s/Ped C. Kay, III
PED C. KAY, III
Broussard & Kay, LLC
909 Garber Rd.
Broussard, LA 70518

## ***CERTIFICATE OF SERVICE***

**I hereby certify that on September 3, 2015, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.**

s/Daniel S. Foley
**Daniel S. Foley**