UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JASON DEROUEN | CIVIL ACTION |
| VERSUS | NO. 13-4805<br>C/W 13-4806 AND<br>13-5060 |
| HERCULES LIFTBOAT CO., LLC ET AL. | SECTION "L" (3) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### I.   PROCEDURAL HISTORY

Plaintiffs, Jason Derouen, Lollo Francis, III and Nathaniel Parker, claim that on September 26, 2012, they were injured while being transferred on a personnel basket from the lift boat, M/V Tilapia, to the stern deck of the M/V Sun Ray.  The Plaintiffs are not seamen but the incident occurred over navigable waters in the Gulf of Mexico within the territorial waters of Louisiana.  The Plaintiffs filed an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure against Hercules Liftboat Co, LLC, the owner of the M/V Tilapia, and Y&S Marine Inc., Sun Boats Inc.  According to the Plaintiffs, Y& S Marine operated and controlled the crew on board the M/V Sun Ray, and Sun Boats owned the Sun Ray.  Also made defendants are Tho Duc Nguyen, the captain of the Sun Ray, Timothy Sykes, the deckhand, and the vessel's insurer, Samsung Fire & Marine Insurance Co.  Y&S Marine and Sun Boats filed an answer in which they deny liability and seek exoneration from and or limitation or liability under the Limitation of Liability Act.  Hercules filed an answer and denied liability.  The defendants Y&S Marine and Sun Boats have dismissed the limitation claim, and the Plaintiffs have dismissed their claims against Tho Duc Nguyen and Timothy Sykes.  Because the medical aspect of this case was incomplete, the case was bifurcated on January 20, 2015, between liability and

quantum.

The liability phase of this case came on for a non-jury trial on September 21, and concluded on September 23, 2015. The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, and the entire record, and hereby enters the following findings of fact and conclusions of law. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. And to the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.     FINDINGS OF FACT

(1)

The incident occurred during a transfer of personnel by means of a collapsible personnel basket from the elevated liftboat, L/B Tilapia, to the crew boat, M/V Sun Ray, during the morning hours of September 26, 2012.

(2)

Hercules Lifeboat Co. LLC is a limited liability company, chartered under the laws of Delaware and doing business in Louisiana. Hercules is the owner of the L/B Tilapia.

(3)

The M/V Sun Ray is a 65 foot by 17 foot crew boat. The M/V Sun Ray was owned by Sun Boats, Inc., and bare boat chartered to and operated by Y&S Marine, a corporation organized under the laws of Louisiana with its principal place of business in Louisiana.

(4)

At all relevant times both Hercules and Y&S were working for Chevron, the owner and operator of the BM-O-3 Oscar, a fixed offshore oil platform, located in the Gulf of Mexico within the territorial waters of Louisiana.

(5)

The L/B Tilapia was elevated adjacent to the BM-O-3 Oscar. The top deck of the BM-O-3 was approximately 35 feet above the surface of the water. The Tilapia's bow was "faced up" to the platform and its deck was also elevated 35 feet above the water surface, even with the top deck of the fixed platform.

(6)

Grand Isle Shipyards was hired by Chevron to perform certain construction/electrical work on Chevron's offshore platform. Jason Derouen, Lollo Francis, III and Nathaniel Parker were the employees of Grand Isle Shipyards who were to be transferred onto the M/V Sun Ray.

(7)

On the morning of September 26, 2012, the M/V Sun Ray was dispatched to the L/B Tilapia to perform the transfer of the three Grand Isle Shipyard employees from the L/B Tilapia onto the M/V Sun Ray. A larger vessel, the M/V Revelation, was normally used in field to ferry the workers from one location to another. However, on the morning of the transfer in question, the M/V Revelation was delayed. Hence, at about 5:30 a.m., the M/V Sun Ray was dispatched to the Platform to transport the Grand Isle employees to surrounding platforms so they could perform their work. Because it was a smaller vessel in comparison with the M/V Revelation, the Sun Ray presented additional challenges when landing a personnel basket on its smaller deck space. Moreover, a smaller vessel, such as the Sun Ray, has a proclivity to roll, pitch, sway, surge, and/or heave more in marginal seas than a larger vessel.

(8)

The transfer was to be accomplished by using a four-man collapsible Billy Pugh Personnel Basket in accordance with Chevron's and Hercules's rules and standards. The

personnel basket is moved by a crane located on the L/B Tilapia.

(9)

The crane operator aboard the L/B Tilapia at the time was Richard Flores, and the captain was Christopher Stokes. The Sun Ray had a two-man crew consisting of the captain, Tho Duc Nuyen, and the deckhand, Timothy Sykes.

(10)

The sea conditions on the morning of September 26th are disputed, but the dispute is relatively minimal. The on-sight observers such as the captain and deckhand on the M/V Sun Ray and the captain and deckhand on the Tilapia estimate the wave height as being two to three foot seas. Although there is data which indicates that the height of the waves were 1.3 feet, this data is from a station over 20 miles away from the site of the Tilapia, and this data is not significantly different from the on-site estimates. Moreover, the estimates were made by experienced individuals who live and work in the area and are very aware of weather and wave conditions. Accordingly, the Court concludes that the weight of the evidence supports the conclusion that the seas were between two and three feet high. The winds were variable at five to fifteen knots. The wind, waves, and current were coming from the Southeast.

(11)

Prior to beginning a personnel transfer, Hercules's policies and best practice procedures call for the crane operator and the captain of the Tilapia to complete the following:

(a) Obtain a valid Permit To Work;

(b) Complete a job safety analysis (JSA) with the liftboat captain, the crane operator, and the riders as well as a verbal JSA with the captain of the crew boat;

(c) Utilize a weather scorecard; and

   (d) Perform a "dry run" where the crane operator practices landing the empty personnel basket on the deck of the crewboat.

(12)

A valid Permit To Work was not issued, a weather score card was not used, and a dry run was not performed. In short, Hercules's policies and procedures were violated, or, at the very least, ignored. Moreover, the participants did not discuss the procedure that they intended to follow in making the transfer. For example, they did not indicate whether the basket was to make contact with the deck of the Sun Ray when the vessel was on the top or crest of a wave or in the trough or bottom of the wave. This is significant, because the captain of the Sun Ray, the crane operator, and the captain of the Tilapia all believed that safe practice called for the basket to make contact with the deck of the Sun Ray when the vessel was at the bottom or trough of a wave. This was consistent with safe practices which Chevron, the owner and operator of the BM3-Oscar, expected their contractors such as Hercules and Y&S Marine to follow. Nevertheless, the deckhand on the Sun Ray, Timothy Sykes, believed that the basket should contact the deck of the Sun Ray when the vessel was at the crest or top of a wave and not at the bottom of the wave. He testified that this procedure was consistent with his training. Had the participants discussed the procedure they intended to employ in making the transfer during the JSA, they would have become aware of their diverse views and devised an agreed uniform procedure.

(13)

Because of the direction of the wind and seas ,Tho Duc Nguyen, the Captain of the Sun Ray, decided to position the stern of his vessel off the port side of the M/V Tilapia, with his stern faced to the seas. He used his engines to maintain his position. The port crane on the L/B

Tilapia was used to lift the basket and position it over the M/V Sun Ray.

(14)

At between 6:15 and 6:30 on September 26, the transfer began. Sunrise had not yet occurred; the sky was instead dimly lit in a period of nautical twilight. Flores, the crane operator, was positioned on his crane about forty-five or fifty feet above the water line. Due to the limited lighting and his location on the crane, Flores could not see the condition of the seas and was dependent on the Captain of the Sun Ray to warn him of any unusual wave action. The crane operator, however, did not communicate this to the Sun Ray's Captain. Thus, Captain Nguyen did not know that the crane operator's vision was impaired and that the crane operator was depending on the Sun Ray's personnel to alert him to dangerous swells. There were lights on the deck of the Sun Ray, and the crane operator could see the deck but not the condition of the seas. The captain and deckhand on the Sun Ray were in a better position to see the sea conditions.

(15)

The three Grand Isle employees got on the basket, and Flores, the crane operator, lifted the basket off of the deck of the Tilapia and swung it over the port side of the Tilapia. This was Flores's first time to attempt a transfer to the Sun Ray. The Captain of the Sun Ray, who was at the rear controls facing the stern of his vessel, instructed Flores to change the angle of his boom so the Sun Ray could position itself a little further away from the Tilapia so that the Sun Ray would not collide with one of the legs of the Tilapia.

(16)

While Captain Nguyen was at the controls maintaining the position of the Sun Ray, the vessel's deckhand, Timothy Sykes, positioned himself on the stern of the Sun Ray, and

proceeded to signal the Tilapia's crane operator to begin the descent of the basket. As the basket descended to the waiting Sun Ray, the vessel rose and fell with the sea. When the basket was lowered to about twelve feet above the water, Sykes gave the signal to stop the descent.

(17)

The Captain of the Sun Ray then positioned the Sun Ray directly under the basket. At this position, the port side of the Sun Ray was approximately ten feet away from a leg of the Tilapia. The boom of the Tilapia crane was capable of extending further so that the Sun Ray could have been positioned even further from the Tilapia's leg, but the captain of the Sun Ray was apparently satisfied and allowed the transfer to proceed. Captain Nguyen used his engines to maintain the position of the Sun Ray's deck under the basket, and this required him to move his vessel back and forward as the seas, wind, and current moved his vessel. While watching the basket, Captain Nguyen also had to keep an eye on the leg of the Tilapia to avoid hitting it.

(18)

When the Sun Ray was positioned with its back deck directly under the basket, Sykes signaled the crane operator to lower the basket toward the deck. The basket landed on the deck of the Sun Ray when the vessel was either at the crest of the wave or moving upward toward the crest. Within seconds, the vessel descended into the trough of the next wave creating a space between the deck and the bottom of the basket which Deckhand Sykes estimated as being chest high or about four feet. This caused the basket to dangle above the deck and prevented the Grand Isle employees from safely getting off of the basket. When the vessel ascended toward the crest of the next wave, the vessel's deck forcefully hit the bottom of the dangling basket. The crane operator released more slack in the line and the basket collapsed on the deck. Two of the Grand Isle employees, Lollo Francis, III and Nathaniel Parker, fell off the basket and violently

struck the deck of the Sun Ray. Jason Derouen became entangled in the basket netting and remained in the basket as it crashed onto the deck.

## III. CONCLUSIONS OF LAW

(1)

Federal Courts are courts of limited jurisdiction. "A party may neither consent to nor waive federal subject matter jurisdiction." *Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1333 which provides original jurisdiction over any admiralty and maritime claims. This accident occurred over navigable waters in the Gulf of Mexico within the territorial waters of Louisiana. Thus, the general maritime law is the substantive law applicable to this case, and venue in the Eastern District of Louisiana is proper. *See* 46 USC § 30101; *Nettles v. Ensco Marine* 980 F.Supp. 848, 852 (E.D. La. Sep 12, 1997).

(2)

The test and standards for a finding of fault or negligence under general maritime law is reasonable care under the circumstances. *See Kermerac v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959) ("It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not part of the crew."); *Leathers v. Blessing*, 105 U.S. 626, 630 (1881); *see also Kermerac*, 358 U.S. at 630–632 (declining to distinguish between invitees and licensees for purposes of evaluating the duty of care owed to non-crew members); *Schoenbaum Admiralty and Maritime Law*, (2d ed. 1994). A party's negligence is only actionable under general maritime law if it is the "legal cause" of the Plaintiff's injuries. *See In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 214 (5th Cir. 2010). The Fifth Circuit defines legal cause as "something more than 'but for'

causation." *Id.* (quoting *Donaghey v. Ocean Drilling & Explor. Co.*, 947 F.2d 646, 649 (5th Cir. 1992).

(3)

General maritime law allows for the imposition of vicarious liability upon employers whose employees commit wrongful acts while acting in the scope of employment. *See Stoot v. D&D Catering Serv., Inc.*, 807 F.2d 1197, 1199 (5th Cir. 1987). Neither Y&S nor Hercules argues that the law of vicarious liability is inapplicable to the case at bar. Thus, it is proper to consider the negligence of the respective employees of Y&S and Hercules to be evidence of their own negligence.

(4)

When two or more defendants are found to be negligent under general maritime law, liability damages will be allocated in proportion to the comparative degree of negligence of each party. *See Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–409 (1953); *The Max Morris*, 137 U.S. 1, 14–15 (1890).

(5)

While a plaintiff's contributory negligence is not a complete bar to recovery under general maritime law, damages will be mitigated in proportion to the plaintiff's share of fault. *See Kermarec*, 258 U.S. at 629; *see also Stowe v. Moran Towing Corp.*, 994 F.Supp.2d. 570, 576 .n3 (E.D. La. Jan. 22, 2014).

(6)

In the present case, it is the conclusion of the Court after hearing the testimony and observing the demeanor of the witnesses, that the joint negligence of Defendants Y&S Marine and Hercules was the cause of the injuries of the Plaintiffs.

(7)

Y&S's first breach of its reasonable duty of care arises from the failure of its employee, Captain Tho Duc Nguyen, to properly communicate with his crane operator counterpart, Richard Flores, regarding personnel basket transfer procedures and sea conditions unique to the transfer at issue. Captain Nguyen's failure to communicate is a breach of the duty of reasonable care, because a reasonable boat captain would affirmatively broach the subject of basket transfer procedures during a first-time personnel transfer with an unknown crane operator. Personnel basket transfers are dangerous activities, and the evidence suggests that best practices for proper transfer procedures are contested.[1] Thus, it was unreasonable for Captain Nguyen to omit a discussion of the crane operator's understanding of proper transfer procedures during the pre-transfer verbal job safety analysis.

The Court also concludes that a reasonable boat captain would be aware that two to three foot seas can occasionally produce significantly higher swells than three feet, and would therefore discuss the best method for avoiding such a swell in his or her first personnel exchange with a crane operator. Captain Nguyen's failure to initiate this conversation constituted a breach of his reasonable duty of care to the Plaintiffs.

(8)

In turn, Hercules's breach of the reasonable duty of care stems from the failure of its

---

[1] During the course of the trial, an issue arose regarding evidence which was not disclosed prior to trial. Y&S presented a manual, Exhibit 65, which supported deck hand Sykes's understanding of proper personnel basket transfers, i.e., a crane operator should try to land the personnel basket at the crest of the wave. Y&S argued that Exhibit 65 was not subject to Rule 26(a) disclosure because it was used as impeachment evidence. The Court admitted the evidence, allowing Plaintiffs and Hercules to rebut the evidence and file responses to its admission. *See* R. Docs. 167, 168, 169, 171. After reviewing counsel's responses, the Court finds Exhibit 65 irrelevant and/or harmless. Y&S and Hercules's joint negligence stems from a failure to communicate regarding competing conceptions of proper personnel basket transfer procedures. Thus, Exhibit 65 is only pertinent insofar as it adds to the voluminous evidence suggesting that reasonable minds might disagree on proper basket transfer procedure, and that reasonable mariners should communicate regarding their understandings of said procedures before a first-time transfer so that they can act in unison.

crane operator, Flores, to communicate regarding personnel basket transfer procedures and any visibility issues he faced aboard the Tilapia. Flores's failure to communicate constitutes a breach of the reasonable duty of care, because a reasonable crane operator would initiate a discussion of proper basket landing procedures during a first-time personnel transfer with an unknown boat captain. A reasonable crane operator would also be aware of any visibility issues from his or her position aboard a lift boat, and would affirmatively raise the issue of visibility if he or she planned to delegate responsibility for identifying abnormally high swells to the operators of the transferee vessel.

Flores's breach of the duty of care is especially troubling, because he failed to follow Hercules's own pre-transfer safety procedures. Flores did not get a valid written Permit to work, use a weather score card, or, most importantly, perform a dry run. This is particularly unreasonable since this was the first time he was involved with a basket transfer to the Sun Ray. Flores's disregard for Hercules's protocol solidifies a finding that he unreasonably flaunted proper pre-transfer safety procedures.

(9)

The negligence of Y&S Marine and Hercules proximately caused the Plaintiffs' injuries and resulting damages. The absence of a clear plan between the Tilapia and Sun Ray concerning the placement of the personnel basket was the legal cause of the accident at issue. The failure to communicate was a substantial factor in causing the multiple violent collisions between the basket and the deck of the Sun Ray. And the Plaintiffs' injuries directly resulted from the botched landing of the basket.

Additionally, the failure of Flores to perform a dry run was also a legal cause of the accident. If Flores had suggested a dry run, Captain Nguyen and Flores's failure to communicate

during the JSA would have been resolved through the process of trial and error. The decision to forego a dry run was thus a substantial factor of the cause of the accident.

However, the failure to discuss who would be responsible for watching for abnormally high swells was not a legal cause of the accident. While a prudent ship captain or crane operator would properly delegate responsibility for observing four or five foot swells in two to three foot seas, Plaintiffs present insufficient evidence for the Court to conclude that an abnormally high swell struck the Sun Ray during the course of the basket transfer. Thus, any breach of duty on this issue is not actionable as negligence.

(10)

Defendant Hercules is 70% liable for Plaintiffs' injuries, and Defendant Y&S is liable for the remaining 30%. As the crane operator, Flores was primarily responsible for the vertical timing of the basket connecting with the deck of the Sun Ray. Therefore, it mainly fell to Flores to adequately communicate his expectations for the upcoming basket transfer procedure. Flores was also obligated to initiate a dry run in a transfer such as the one at issue, and he failed to do so. Therefore, the weight of the negligence falls on Hercules.

As the captain of the transferee vessel, Captain Nguyen also had a duty to affirmatively raise proper personnel basket transfer procedures during the pre-transfer JSA. Captain Nguyen had never completed a transfer with Flores, so he could not rely on past experience as a replacement for a thorough discussion of transfer procedures. When Flores failed to communicate during the JSA his interpretation of the proper vertical timing for a personnel basket transfer, Captain Nguyen became responsible for speaking up and ensuring that all parties had similar expectations. Thus, a portion of the blame rests with Y&S.

(11)

Plaintiffs were not contributorily negligent. The evidence shows that Plaintiffs were trained not to disembark a personnel basket if it were to land at the crest of a wave, and the basket landed either at the crest of the wave or at a point on the crest's incline. In fact, there is a specific instruction in the applicable safety manual stating that "Should the basket contact the boat at the top of a swell, *Do not step off*, as you could fall as the boat drops away from you." Trial Ex. 3.17. Therefore, Plaintiffs' failures to immediately disembark were a result of their training. A reasonably prudent person would rely on their training when partaking in a dangerous operation such as a personnel basket transfer, so Plaintiffs were not negligent.

Further, the evidence conclusively shows that the basket experienced a significant jolt within seconds of touching the deck. The Court cannot find that the three Plaintiffs, who were very experienced with being transported via personnel basket, all negligently failed to disembark on the same transfer. If the transfer provided enough time and stability for the Plaintiffs to safely disembark, one or more of them would have avoided injury.

## IV. SUMMARY

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that Defendants Y&S and Hercules, through their joint negligence, caused the accident which injured the Plaintiffs. The Court specifically finds that Y&S was 30% at fault, and Hercules was 70% at fault. The Court additionally finds no contributory fault on the part of the Plaintiffs.

New Orleans, Louisiana this 20th day of October, 2015.

_____
UNITED STATES DISTRICT JUDGE